**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0292n.06
Filed: April 26, 2007

**No. 06-3893**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| THERESA LEWIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ADAMS COUNTY, et al. | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

Before: DAUGHTREY and ROGERS, Circuit Judges; OBERDORFER, District Judge.[*]

**OBERDORFER, District Judge**. On July 9, 2002, Everett Lewis was shot and killed by

the police in Adams County, Ohio. His wife, Theresa Lewis, on her own behalf and as

administrator of his estate, filed suit in federal district court alleging that the use of deadly force

against Lewis violated the Fourth, Fifth, Sixth and Eighth Amendments to the United States

Constitution and various state laws. Finding no constitutional violations, the district court

granted summary judgment for the defendants on all of the federal claims and dismissed the

remaining state law claims without prejudice. The plaintiff now appeals, challenging only the

district court's grant of summary judgment on the Fourth Amendment claims and its dependent

---

[*] The Honorable Louis F. Oberdorfer, United States District Court Judge for the District
of Columbia, sitting by designation.

dismissal of the state law claims. Because no rational juror could find that the defendant-officers' use of deadly force violated the decedent's Fourth Amendment rights, we affirm the district court's grant of summary judgment.

## I. BACKGROUND

### A. Facts

Up to a point, the facts in this case are not in dispute. The events leading up to Lewis's shooting began on the morning of July 9, 2002. At approximately 7:30 that morning, Lewis, who lived at 1111 Barrackman Road, drove over to David Copher's house, who lived at 510 Barrackman Road, and asked Copher to make a telephone call for him because Lewis did not have phone service at the time. (Although Copher and Lewis were "neighbors," the area was rural and the houses were not within sight of each other.) Lewis asked Copher to call Baxla Tractor Sales, where Lewis worked, and to tell them that he would not be at work that day. Lewis also told Copher that he was getting a divorce.

Rather than calling Baxla Tractor Sales, Copher decided that he would stop by there and relay Lewis's message while he was in town running other errands. Copher left his residence at around 8:00 a.m. and returned home some time between 11:00 a.m. and 11:30 a.m. At approximately 12:00 p.m., Lewis showed up again.

Hearing Lewis's truck pull up outside the house, Copher went out onto to his porch to see what Lewis wanted. According to Copher, Lewis raised his hands, motioned Copher back away from his truck, and said, "I shot the mother f-----s. They're laying in the yard dead. . . . Dial 911. . . . Dave, don't come near the truck." JA 407. When Copher asked whom Lewis had shot, Lewis responded, according to Copher, "The mother f-----s that are moving the stuff out of my

2

house and her." JA 414. Copher thought "her" was Lewis's wife, Teresa. Copher later testified at his deposition that Lewis's "eyes were red and his speech was like he had done it." JA 407.

In response to Lewis's request to Copher to call 911 and to report what Lewis had just told Copher, Copher told Lewis he would do so. Lewis then left, telling Copher that he was going back to his house. Through his window, Copher saw Lewis drive his orange Dodge truck to the end of Copher's driveway and turn right onto Barrackman road, which was the direction back toward Lewis's house.

At approximately 12:36 p.m., Copher called 911 and had the following conversation with the dispatcher there:

| | |
|---|---|
| Copher: | Yes ma'am my name is David Copher and Everett Lewis just cam[e] up here and said that he has 2 victims uh 2 victims up there where he lives at I guess he shot 'em or somethin. |
| Dispatcher: | Two victims? |
| Copher: | That's what he told me to say. |
| Dispatcher: | What's his name? |
| Copher: | Everett Lewis lives out there on Barrackman Road. |
| . . . | |
| Dispatcher: | He shot 'em |
| Copher: | He said he did, he told me not to come up near the truck. |
| Dispatcher: | Where's he at now? |
| Copher: | He just left, he's driving an orange and white Dodge pick up truck, looks like (I can't make it out) but I don't know. He's been going through a divorce type thing. |
| Dispatcher: | Ok did he say he was going back to the . . . |

3

| | |
|---|---|
| Copher: | He said he was going to try to work something out. I don't know what he's going to do. He's driving slow so apparently he's going back up there. I don't know, he shot 'em I guess. I don't know what to do go over there or stay here. |
| | . . . |
| Dispatcher: | Sir, did he go back toward his house or which way did he go? |
| Copher: | Yeah he said he was goin back toward his house so he just told me to call 911. |
| Dispatcher: | You don't happen to know his phone number or anything else do ya? |
| Copher: | His phone been disconnected. |
| Dispatcher: | Disconnected. |
| Copher: | I let him use my phone yesterday to call the Sheriff he said something about getting a restraining order. |
| Dispatcher: | Ok, and did he say who he shot? |
| Copher: | He didn't say anything he just said he had two victims laying on the ground so I don't know what . . . |
| Dispatcher: | Ok we'll get somebody right up there. |

JA 661-63. After receiving Copher's call, the dispatcher immediately alerted the police and officers were sent to Lewis's house to investigate.

Copher then had a second conversation with a 911 dispatcher that was not transcribed. During that conversation, Lewis reappeared at Copher's house. He asked Copher whether he had called 911 and whether the police were coming. He also told Copher that he had hostages in his house, and he warned Copher that no one should come within 100 yards of the house. Lewis was yelling, appeared to have been drinking, and appeared "mad at something." Although the dispatcher could not understand exactly what Lewis was saying, she could hear that he "was

4

agitated" and sounded angry.  JA 529.  Lewis then left again.  As he left, the wheels on his truck were spinning and throwing gravel.  Copher relayed to the 911 dispatcher that Lewis had told him there were three hostages in the house and that no one should come within 100 yards of the house.

At approximately 1:05 p.m. Copher had his third conversation with a 911 dispatcher, during which the following exchange occurred:

Copher:     The first time he showed up he was kinda calm about it. The second time he was kinda pissed so apparently he said he's got three of them in the house.

Dispatcher:     Adams County to 14 be advised he had stated that there was three at the house.

(background noise)

Dispatcher:     These were the three victims or just three people?

Copher:     The first time he said there's two victims in the yard.

Dispatcher:     Two in the yard?

Copher:     and I said what happened he said I shot 'em

Dispatcher:     Ok hang on

Copher:     Then he said, he came back the second time and said I've got three of them in the house and anybody who comes within 100 yards I'm gonna shoot 'em.

Dispatcher:     Ok hang on one second . . . Adams County to 14

14 - 14

Dispatcher:     Be advised there was two in the yard shot and then he comes back and the guy said three in the house.

(Background noise)

5

Dispatcher: Be advised he had three in the house this is from the 911 caller.

Dispatcher: 100 yards

Copher: He said don't come ya know once your in the driveway or get up in the driveway or apparently he can get a shot out I don't know

Dispatcher: Ok but how far is that?

Copher: Well he said don't come within 100 yards of the house.

Dispatcher: Ok . . . Adams County to 14 be advised 100 yards of the residence.

Copher: He has guns there he's a deer hunter.

Dispatcher: He has several guns.

Copher: Uh I know he's I've heard a shot gun that he had. I don't know what he shot 'em with but I was in the house so he does deer (noise)

Dispatcher: Yeah but he does have weapons, he is a hunter. He does have weapons. He is a hunter.

. . . .

JA 663-64.

During and after each conversation with Copher, the dispatchers relayed the additional information he was reporting to the police. After Copher reported that Lewis claimed to have hostages and was threatening serious consequences to anyone who came within 100 yards of the house, the responding officers were told not to approach the residence or Lewis himself until other officers arrived at the scene. One officer, Detective Jeffrey A. McCarty, told the 911 dispatcher to get the Special Response Team to the location.

Ultimately, seven Adams County police officers responded and headed to 1111 Barrackman Road, Lewis's home address: Sheriff Kermit G. Howard, Deputy John Sheeley,

6

Detective Jeffrey A. McCarty, Deputy Benjamin Mathias, Deputy Shawn D. Cooley, Deputy Richard L. DeMint, and Chief Deputy Harry Bowman. Deputy Sheeley was the first officer on the scene. As instructed, he stopped on Barrackman Road about one-third of a mile away from the end of the driveway and waited for other officers to arrive. Because it was a long driveway (approximately 400 yards) and there was a rise in the driveway between the house and the road, the house itself was not visible from the road. While Deputy Sheely was waiting for other officers to arrive, he saw Lewis's orange pickup truck approaching from the other direction, turn into the driveway and head toward the house.

Once other police officers began to arrive, they moved to where the driveway met Barrackman Road, planning to await the arrival of a SWAT team and/or a hostage negotiator before taking any further action. In the meantime, Deputy Sheeley drove to an adjacent property, hoping to find a point from which to observe the Lewis property. By climbing up on a fence and using binoculars, he was able to see the top half of the front door of Lewis's house and about one foot of the top of Lewis's pickup truck, but he could not see the yard. While Sheeley was watching, Lewis emerged from the house, got into his pickup truck, did three "donuts" in the yard, and then began driving down the driveway toward Barrackman Road. Sheeley radioed this information to the officers gathered at the end of the driveway and then headed back there himself.

Lewis stopped his truck before he got to the end of the driveway. He got out and, standing behind the door of the truck, began yelling at the officers. The officers could not understand what he was saying. Lewis then reached into his truck and pulled out a rifle and pointed it at the officers through the driver's door window. The officers ordered Lewis to drop

7

his rifle and get on the ground, but he refused. Instead, Lewis got back into his truck and began backing up rapidly toward his house.

When Lewis starting backing up, the officers got into their vehicles and pursued him. Detective McCarty and Deputy DeMint were in the lead vehicle, followed by Deputies Cooley and Mathias in a second, larger vehicle. Neither car was able to get around Lewis's truck to stop him before he got back to the house because of the dust created by his vehicle. When these four officers arrived at the house, virtually simultaneously, Lewis was already out of his truck. He was rapidly sidestepping from his truck to the porch, holding his rifle low and pointing it at the officers as he moved across the yard. The officers got out of their cars and ordered Lewis to put his rifle down, but he ignored the orders and continued moving toward the porch of his house.

Precisely what happened next is disputed. According to the defendants (and the district court), Lewis got onto his porch, backed up toward the door of the house, and grabbed the door knob as if to enter. He then stopped and aimed his rifle directly at the officers. According to the plaintiff, whether or not Lewis was actually on the porch when he was shot, and whether or not Lewis was actually pointing his rifle at the officers at the time he was trying to enter the house are disputed facts.[1]

What happened next is not disputed. All four officers on the scene – Detective McCarty, Deputy Cooley, Deputy Mathias, and Deputy DeMint – fired (virtually simultaneously) at Lewis. After Lewis fell to his knees, Deputy Cooley ran up onto the porch and moved Lewis away from his gun, while another officer took possession of the gun. Lewis made no other sounds or

---

[1]The plaintiff's attorney's suggestion at oral argument that there is a genuine issue as to whether Lewis actually had a gun simply because there is no crime scene picture of him holding a gun borders on frivolous in light of the substantial record evidence to the contrary.

movements after he was shot. Following the shooting, some of the officers entered the house looking for hostages, but none were found. The officers also searched the premises for shooting victims, but found none. Medical help for Lewis was called, but he died from his wounds. The other officers arrived on the scene after Lewis had been shot.

Two bullets hit Lewis. The trajectory of the fatal gunshot wound was from back to front, right to left, and slightly downward, with the entrance in the right lateral chest and the projectile recovered in the left breast soft tissue. The other gunshot entrance wound was in the left buttock with the trajectory from back to front without significant lateral or vertical deviation. It was not possible to determine from which gun any particular bullet was fired. Lewis never fired his weapon.

In the immediate aftermath of the shooting, there was an investigation. While the investigation team made a number of apparent errors, none are material to the issues raised on appeal.

## B. Procedural History

Following Lewis's death, his wife Teresa, on her own behalf and as the administrator of his estate, filed the pending complaint in federal district court for the Southern District of Ohio, alleging that the officers' use of deadly force violated Lewis's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Ohio law. She named as defendants six Adams County police officers (in their individual and official capacities): Sheriff Howard, Detective McCarty, and Deputies Mathias, Cooley, DeMint, and

Sheeley[2]; Adams County; the Adams County Sheriff's Department; and the three Adams County Commissioners (in their official capacities).

The district court granted the defendants' motion for summary judgment. Concluding that Lewis's Fourth Amendment rights were not violated because the officers' use of deadly force was "'objectively reasonable' in light of the facts and circumstances confronting them," the district court dismissed the Fourth Amendment excessive force claims against all of the defendants.[3] It also ruled that the Fifth, Sixth, and Eighth Amendments were "clearly inapplicable" to the case. Having resolved all the federal claims in favor of the defendants, the district court dismissed the state law claims without prejudice, pursuant to 28 U.S.C. § 1367(c).

The plaintiff filed the instant appeal, challenging the district court's grant of summary judgment for the defendants on the Fourth Amendment excessive force claims and, should it succeed in reversing summary judgment on those claims, seeking reinstatement of its state law claims.

## II. LEGAL PRINCIPLES

### A.    Summary Judgment Standard

We review de novo the district court's grant of summary judgment. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is permitted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

[2]For reasons that are not immediately apparent from the record, she did not name Chief Deputy Bowman as a defendant.

[3]The district court's other reasons for dismissing the Fourth Amendment claims against these defendants are not relevant given our agreement with the district court that there was no underlying Fourth Amendment violation.

10

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is "material" if the dispute over it might affect the outcome of the lawsuit under the governing law. *Id.* In determining whether there are genuine issues of material fact, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Id.*

**B.      Fourth Amendment Excessive Force Claim**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. Amend. IV. Under the Fourth Amendment, "the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Graham v. Connor,* 490 U.S. 386, 395 (1989) (citing *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985); *St. John v. Hickey,* 411 F.3d 762, 771 (6th Cir. 2005). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397. The Supreme Court in *Graham* instructed reviewing courts to consider various factors in evaluating excessive force claims. *St. John v. Hickey,* 411 F.3d at 771. The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396 (citing

11

*Garner,* 471 U.S. at 8-9). "[T]he ultimate question is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *St. John v. Hickey,* 411 F.3d at 771 (quoting *Graham*, 490 U.S. at 396). In resolving this question, the court must "carefully balance the nature of the intrusion on the [individual's] Fourth Amendment rights against 'the countervailing governmental interests at stake.'" *Id.* (quoting *Garner,* 471 U.S. at 8). The Sixth Circuit has noted that "'[t]his standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.'" *Id.* (quoting *Burchett v. Kiefer,* 310 F.3d 937, 944 (6th Cir. 2002)). Finally, whether the force used was reasonable must be judged from the perspective of a reasonable police officer on the scene. *Graham,* 490 U.S. at 396.

With respect to the use of deadly force, certain specific rules apply. For example, "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005) (citing *Garner*, 471 U.S. at 11). Rather, the use of deadly force is only constitutionally permissible if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." *Garner*, 471 U.S. at 11; *see also Sample*, 409 F.3d at 697 (noting that "only in rare instances may an officer seize a suspect by use of deadly force" (internal quotations omitted)).

### III. DISCUSSION

In the present case, the plaintiff contends that the defendants deprived Lewis of his Fourth Amendment rights by using excessive (deadly) force against him, resulting in his death. The district court concluded that the shooting of Lewis was reasonable because Lewis posed an

immediate threat to the officers <u>and</u> to the hostages the officers believed were inside the residence.  It explained its decision as follows:

> Taken in the light most favorable to plaintiff, the facts alleged do not show that the defendant officers' conduct violated Everett Lewis's Fourth Amendment rights.  The officers' actions in shooting Lewis were 'objectively reasonable' in light of the facts and circumstances confronting them. It had been reported to the officers, but not verified, that Lewis had shot two individuals and had three hostages in his house; Lewis posed an immediate threat to the safety of the officers or others since he was armed with a rifle that he had aimed at the officers and appeared willing to use; and Lewis was attempting to flee from the officers and enter his residence when they shot him. The officers were therefore confronted with a rapidly evolving and highly volatile situation that required them to use their judgment on-the-spot, without the benefit of consultation and the verification of information provided by the police dispatchers.  Neither the court nor a jury can, with the benefit of hindsight, adjudge the actions of these officers in dealing with an armed individual who posed a threat to the safety of both the officers and possibly to individuals being held hostage to have been unreasonable.

Dist. Ct. Op. at 18-19 (JA 39-40).

On appeal, the plaintiff argues that the district court erred in granting summary judgment for the defendants on the Fourth Amendment excessive force claims because it ignored "conflicting evidence concerning how Mr. Lewis died," and failed to "construe the facts most strongly in favor of the [plaintiff]," leading it to conclude erroneously that the individual officers did not use excessive force when they shot at and killed Lewis.  Rather, the plaintiff asserts, the facts and physical evidence, viewed in their entirety and in the proper light, suggest (and a reasonable jury could conclude) that shooting Lewis was unreasonable.   For the reasons explained below, we disagree.

## A.    Did the District Court's Analysis Ignore Conflicting Evidence?

The plaintiff contends that the district court's analysis ignored material conflicting evidence, in particular an affidavit from the plaintiff's expert forensic witness, Mr. Larry Dehus,

13

opining that the physical evidence in the case was not consistent with the individual officers' statements as to how the shooting occurred.   In relevant part, Dehus's affidavit states:

> For Mr. Lewis's wounds to have occurred while he was standing on the front porch, he would had to have been facing the northwest corner of the porch at the time they[sic] side wound was inflicted and would had to have been facing the front door at the time the wound to the buttocks was inflicted.  Therefore, his back would have been towards the officers based upon their reported locations and the location of the fired cartridge casings.  Diagram # 1 shows the probable trajectory of the bullet that struck Mr. Lewis in the right side and his position at the time of that shot.  Diagram # 2 shows the probable trajectory of the bullet that struck Mr. Lewis in the left buttocks and his position at the time he was struck by that bullet. Considering these positions, it is the opinion of this examiner that it is highly unlikely that Mr. Lewis could have been pointing the rifle at the deputies at the time that they discharged their weapons.

JA at 198-99 (emphasis added).  Dehus also opined that based on the trajectory of the bullets, "Either Mr. Lewis was not on the porch when this shot was fired or the deputies were firing from an extremely high position."  JA 197.

The plaintiff argues that the Dehus affidavit creates genuine issues as to three facts – (1) whether or not Lewis was facing the officers at the time the officers fired; (2) whether or not Lewis was pointing his rifle at the officers at the time the officers fired; and (3) whether or not Lewis was on the porch at the time the officers fired – and that these are material disputes, thereby precluding summary judgment on the question whether the officers used excessive force against Lewis.   We will consider first whether the Dehus affidavit creates a genuine issue as to any of these facts and then consider whether, if it does, that disputed fact is material.

**1.      Is there a genuine issue as to whether Lewis was facing the officers?**

The plaintiff argues that the Dehus affidavit calls into question the officers' testimony that Lewis was facing them when they fired.  There are two problems with the plaintiff's

14

argument. First, it supposes that there is testimony from the officers that Lewis was facing them when they fired their guns. However, as the district court noted and as a review of the officers' testimony confirms, the officers did not testify that Lewis was facing them, but rather that the upper portion of his body was turned toward them. *See, e.g.*, McCarty Aff., JA 250-51 ("His face was also turned to his right and he was looking directly at us. The anterior portion of his body was about 90 degrees turned away from us to our right."). Thus, there is no "conflict" between the Dehus affidavit and the officers' testimony. Second, the defendants do not contend that Lewis was facing them when they fired. Rather, they "agree" with the Dehus affidavit that at the time the shots were fired the front of Lewis's body was facing the northwest corner of the porch – not directly facing the officers. Def. Br. at 32. And they took the same position before the district court. *See* Dist. Ct. Op. at 19-20 (JA 39-40) ("defendants do not allege, and have not presented any evidence to suggest, that Lewis was standing with his body facing the officers when they shot him"). Accordingly, the district court did not ignore conflicting evidence, but rather correctly recognized that there was no conflict between the Dehus affidavit and the officers' testimony on this point and, therefore, no "issue."

2. **Is there a genuine issue as to whether Lewis was pointing his rifle at the officers?**

The plaintiff argues that the Dehus affidavit also calls into question the officers' testimony that Lewis was pointing his rifle at them when they fired and that this conflict creates a genuine issue of material fact, precluding summary judgment. In this instance, there is a clear conflict between the officers' testimony (all of whom testified that Lewis raised his arm and pointed his rifle directly at them) and the Dehus affidavit which states that, in his opinion, it is

"highly unlikely that Mr. Lewis could have been pointing the rifle at the deputies at the time that they discharged their weapons." The district court recognized that Dehus's affidavit conflicted with the officers' testimony, but concluded that it alone was "insufficient to create an issue for the trier of fact as to whether plaintiff was pointing his rifle at the officers when they fired at him" in the face of the consistent deposition testimony from all of the officers at the scene and the opinion of the medical examiner that the physical evidence was consistent with the officers' testimony. Dist. Ct. Op. at 18 (JA 38).

As noted previously, an issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Id.* at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. If a court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id*.; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The question on appeal is whether the district court properly determined that even though there was a dispute over whether Lewis was pointing his gun at the officers, there was not enough evidence from the plaintiff to send that issue to the jury or whether the district court improperly "weighed" the evidence on summary judgment. We agree with the district court that

16

the plaintiff did not submit enough evidence to get to a jury on the issue of whether Lewis was pointing his rifle at the officers. One expert's opinion that it is "highly unlikely" that Lewis was pointing his rifle at the officers in the face of the consistent deposition testimony from all of the officers at the scene and the opinion of the medical examiner that the physical evidence was consistent with the officers' testimony is simply not enough to take that issue to a jury. *Cf. DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418, 427 (6th Cir. 2006) (holding that a single expert report speculating that the facts might be different than reported was not sufficient to create a genuine issue of material fact); *Boyd v. Baeppler*, 215 F.3d 594, 603 (6th Cir. 2000) (same).

### 3. Is there a genuine issue as to whether Lewis was on the porch when he was shot?

The plaintiff also argues that the Dehus affidavit creates a genuine issue as to whether Lewis was on the porch when he was shot. The district court rejected that exact argument, explaining its reasoning as follows:

> Those present at the scene all placed Lewis on the porch at the time he was shot, and their accounts are consistent with the fact that the blood found at the scene was on the porch. Accordingly, a reasonable fact-finder could not discount the officers' testimony that Lewis was on the porch about to enter his house when they fired based only on Mr. Dehus's conjectural opinion that either plaintiff was not on the porch when one of the two shots struck him or the officers were firing from an extremely high position.

Dist. Ct. Op. at 18-19 (JA 38-39). In this instance, the district court's conclusion is clearly correct. Given that all of the blood was on the porch, we do not see how a reasonable jury could conclude that Lewis was not himself on the porch at the time he was shot.

### 4. If there is a genuine issue, is the dispute material?

17

As explained above, we are not persuaded that the district court overlooked any "genuine issues." Even if the dispute over whether Lewis was pointing his gun at the officers were a "genuine issue," the question would remain whether that dispute is material. That is, assuming the truth of the plaintiff's version of the facts, would it lead to the conclusion that the officers used excessive force? As explained below, we do not believe that it would.

**B.      Did the District Court Fail To Construe Evidence in the Plaintiff's Favor?**

The plaintiff also contends that the district court failed to construe the evidence in her favor and that this failure led to the erroneous conclusion that the use of deadly force was justified. Specifically, she faults the district court for concluding that the following two facts were immaterial to the lawfulness of the decision to use deadly force: (1) the individual officers' failure to verify, in her words, the "preposterous" telephone calls by David Copher; and (2) again in her words, the "indiscriminate" shooting into Lewis's residence.

**1.      Did the district court fail to construe the evidence in the plaintiff's favor when it concluded that the failure to verify Copher's 911 report was "immaterial"?**

The district court concluded that the failure to verify Copher's telephone calls was "immaterial . . . given the . . . circumstances that confronted the officers after they responded to the call." Dist. Ct. Op. at 23 (JA 43). The plaintiff argues that if the district court had properly construed the evidence in her favor, it would have concluded that the officers' failure to verify was material because these were "ludicrous" phone calls from a paranoid schizophrenic.

The primary problem with the plaintiff's argument is that it assumes facts for which there is absolutely no evidentiary support. Throughout her brief, the plaintiff refers to Copher as a "paranoid schizophrenic." However, the plaintiff has not identified, and we have not found, any

18

record evidence to support the plaintiff's suggestion that Copher's condition was or should have been "known" to the 911 dispatchers and/or the police officers at the scene, thereby alerting them to the possibility that he was not accurately reporting what Lewis told him. Indeed, there is deposition testimony to the contrary. *See*, *e.g.*, Howard Dep. at 71-72 (JA 474). Thus, although the plaintiff suggests that the issue is whether the police should verify a report of murders and hostage-taking from a known paranoid schizophrenic before using deadly force, the facts of the present case do not actually raise that question and, accordingly, we will not attempt to answer it here.[4]

The plaintiff also faults the district court for not mentioning the opinion of her police practices expert, Ken Katsaris, that the failure to verify Copher's call rendered the application of deadly force "unquestionably objectively unreasonable and excessive." Pl. Br. at 25. However, an expert opinion that merely expresses a legal conclusion is properly ignored. *See DeMerrell*, 206 Fed. Appx. at 426.

Accordingly, we conclude that the district court did not fail to construe the facts in the plaintiffs' favor in terms of evaluating the materiality of the failure to verify Copher's 911 report.

2.    **Did the district court fail to construe the evidence in the plaintiff's favor when it concluded that the "indiscriminate" shooting was immaterial?**

---

[4]We note that current law holds only that it is a "relevant factor" in evaluating the reasonableness of an officer's conduct in a direct encounter that the officer knows that person with whom the encounter is occurring is "experiencing some sort of mental or emotional difficulty." *See*, *e.g.*, *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of [his] autism and his unresponsiveness. The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.").

19

In relevant part, the bullet damage was as follows:

> [T]he front of the house had several possible gunshot holes. . . . Several gunshot holes were observed on the south, west and east walls. One projectile was observed on [the] floor in front of [the] middle bedroom door. A second projectile was observed on [the] bed in [the] first or master bedroom.
>
> . . .
>
> The front of the residence contained approximately eight round[s] in the front gable and facing. One round entered the right side of the front porch to the left of the bedroom window. The screen door had gunshot hole[s] in the lower portion of the door and one to the left side of the screen door frame. Search inside residence revealed several gunshot holes in the south and west wall[s]. The screen door glass had shattered from gunshots. . . . [O]ne round [removed] from west wall and another round had entered south wall and exited the house into the side yard.

JA 198.

The district court concluded that "the facts that shots were fired into the house when the officers'[sic] fired at Lewis does not, however, call into question the reasonableness of the officers' use of deadly force against Lewis." JA 39. On appeal, the plaintiff argues that the court should have considered the bullet damage because "the number and location of the shots that penetrated the residence directly counters [the officers'] claim that they believed the residence was occupied." Rather, she maintains, it is evidence that the officers "did not truly believe hostages remained in the residence." Pl. Br. at 32. And absent a risk to hostages, the use of deadly force to prevent Lewis from entering his own house was unlawful. The plaintiff's theory is supported by the Dehus affidavit, which states that "[i]f the deputies were concerned about the safety of hostages within the interior of the house, that was not displayed when a large number of shots were fired into the house." JA 198. However, the evidence that the officers actually and reasonably believed that Lewis had hostages is substantial, including Copher's multiple 911

20

calls, the absence of any obvious reason to doubt the truth of Copher's report, the deposition testimony of all of the officers, and the fact that all of the officers fired at once. In order for a jury to believe the inference that the plaintiff suggests it could draw from the bullet damage, it would have to also believe that all of the officers were lying and that they simultaneously and without conversation all knew that there weren't any hostages but decided to fire anyway. Although the plaintiff is entitled to have all reasonable inferences drawn in her favor, to infer from the bullet locations that the officers were shooting indiscriminately and, therefore, that they didn't really believe that there were hostages inside, is simply not a reasonable inference given the other evidence in the record. Accordingly, we conclude that the district court did not fail to construe the bullet evidence in the plaintiff's favor when it concluded that it was "immaterial."

## C. Under the totality of the circumstances was the shooting of Lewis objectively reasonable?

The plaintiff's bottom line is that the district court erred in concluding based on the undisputed facts and as a matter of law that the use of deadly force was objectively reasonable. Of the various specific challenges the plaintiff makes to the district court's analysis (discussed above), we have found none to be meritorious. The question remains whether taking the uncontroverted facts as stated by the district court and drawing all plausible inferences in the plaintiff's favor, whether the shooting was objectively reasonable – that is, did the officers have probable cause to believe that Lewis posed a serious threat of injury to the police officers or others?

What the officers knew at the time was: that there had been a 911 report by Copher that Lewis had claimed to have killed two people and to have three others held as hostages in his

house; that Lewis had recently separated from his wife and that she had taken all of his children; that he had been trying to get a restraining order against his wife that morning; that he had left his house in his pickup truck, driven partway down his driveway toward the police, gotten out of his car and pointed the gun at them; that while out of his car in the driveway he had ignored police instructions to put down his gun and surrender; that he had gotten back into his car and backed up to his house, exited the car carrying his gun and scurried back onto his porch, apparently trying to reenter his house through the screen door; that while moving from his truck to the porch door, he ignored police instructions (again) to put down his gun and surrender; that he pointed his gun at them; that the police had no reason not to believe that Copher was not accurately reporting what Lewis told him to tell the 911 dispatcher; and that the only reason the police might have doubted the veracity of Lewis's claim at the time was that they did not see any dead bodies in the yard. Given these circumstances, we conclude that the officers' actions were objectively reasonable.

As noted above, the plaintiff contends that the district court erred in treating as "uncontroverted" the fact that Lewis pointed his gun at the officers. But even if Lewis did not point his gun at the officers (or if we assume that there is a genuine issue as to that fact), the outcome would not change. If Lewis was not pointing his gun at the officers, the immediate danger to them is arguably diminished. *But see Livermore v. Lubelan*, 476 F.3d 397, 405 (6th Cir. 2007) ("Even assuming that [the suspect] was not aiming his rifle at the [light-armored vehicle] when he was shot, we nonetheless conclude that [the police officer who shot him] had probable cause to believe that [the suspect] posed a serious threat to the officers in the [light-armored vehicle] . . . due to his proximity to the [light-armored vehicle] while armed with a rifle,

22

his prior violent behavior, and his continued refusal to surrender and face arrest.") Moreover, in the present case the officers had another basis for shooting – to protect the hostages they believed Lewis held inside the house. Ultimately, police in the circumstances could have reasonably believed that there were hostages in the house, that Lewis would shoot them if he could, and that application of deadly force to Lewis was the last clear chance to save them. The fact that there turned out not to be any hostages is immaterial. As long as the evidence supports the conclusion that the officers had probable cause to believe that Lewis posed a serious threat of injury to hostages, the shooting was justified. *See*, *e.g.*, *Untalan v. City of Lorain*, 430 F.3d 312 (6th Cir. 2005) (no Fourth Amendment violation where an officer reasonably, though perhaps incorrectly in hindsight, perceives an immediate and serious threat from the suspect).

Our conclusion here is consistent with two recent Sixth Circuit cases where the court found no Fourth Amendment violation. In the first, *Livermore*, which is cited above, the suspect was on his own property, armed, and refusing to surrender to the police (he had emerged from his residence after setting it on fire). The police attempted to confront him by entering onto his property in a light-armored vehicle. In order to have radio communication, two of the three officers in the vehicle had to partially emerge, exposing themselves to danger. The officers in the vehicle could not see the suspect due to darkness and smoke. A police-stationed sniper 150 yards away saw the suspect pointing his gun at the vehicle and tracking it as it moved. Believing that the exposed officers were in danger, the sniper fired and killed the suspect. The district court denied the defendants' motion for summary judgment, but this court reversed, concluding that the sniper's use of deadly force against the suspect was objectively reasonable, even if the suspect was not actually pointing his gun at the officers. In the second, *DeMerrell v. City of*

23

*Cheboygan* (also cited above), the suspect was intoxicated, agitated, waving a gun around and inviting the officers to shoot him. The officer who shot and killed the suspect fired after the suspect pointed the gun at him and took a few steps in the officer's direction. The other officers on the scene did not fire, although they testified that they were about to. It turned out that the suspect only had a pellet gun. The district court concluded, and this Court affirmed, that there was no Fourth Amendment violation.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment for all defendants.