**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0376n.06

No. 12-3672

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
*Apr 16, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JESS R. BURDINE, Individually and as Administrator of the estate of Craig A. Burdine; MARDELLA BURDINE, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| SANDUSKY COUNTY, OHIO; FRANKLIN W. KAISER, Deputy; KYLE OVERMYER, Sheriff; TINA TACK-ANDERSON, Deputy; JOHN C. WHITE, Deputy; DIANE L. BLUE, Captain and Deputy; TERRY MYERS, Retired Sergeant and Deputy; THOMAS FLIGOR, Major and Deputy; BRUCE HIRT, Chief and Deputy, Sandusky County Sheriff's Office; CITY OF FREMONT; MONTE HUSS, Former Chief; TIMOTHY WEIRSMA, Chief; LESTER W. DANIELS, Officer; TY CONGER, Officer; MICHAEL P. DICKEY, Officer; ANTHONY EMRICH, Officer; JASON KIDDEY, Officer; RICHARD COOK, Captain, Fremont Police Department; JEFF JACKSON, Director; JOHN GRIGGS; JESSICA BERLEKAMP-CROWELL, Sandusky County Emergency Medical Services, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE:  KEITH, COLE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.  Craig Burdine died on August 11, 2007, after being arrested by

Fremont, Ohio, police officers and transported to the Sandusky County jail.  His parents filed suit

against the county, city, and individual officers under § 1983 and Ohio law, claiming the officers used excessive force. The district court granted the defendants' motion to dismiss all federal and state-law claims on the grounds that the defendants were shielded by qualified immunity, either because their conduct was reasonable under the Fourth Amendment or because they did not take physical action against Burdine. Plaintiffs now argue that the district court erred by failing to construe the evidence in the light most favorable to them, as nonmovants, in granting the motion for summary judgment. Because plaintiffs have not raised any genuine issue of material fact showing that any officer unreasonably applied excessive force in violation of the Fourth Amendment, each officer is entitled to qualified immunity under federal law and governmental immunity under Ohio law. Although we recognize that plaintiffs have suffered a devastating loss, the district court properly granted the motion for summary judgment.

At approximately 3:30 a.m. on August 11, 2007, Fremont police officers Lester Daniels, Ty Conger, Michael Dickey, and Anthony Emrich responded to a report of a fight on Sycamore Street in Fremont, Ohio. Daniels arrived first and observed Craig Burdine bearing visible injuries. When Daniels approached Burdine and attempted to engage him, Burdine—who the officers thought might be intoxicated—lunged and possibly swung at Officer Daniels. In the ensuing struggle, Burdine was pepper sprayed, subdued by Daniels and the other officers, and placed in handcuffs. Burdine then refused to cooperate, passively resisting by not complying with any of the officers' commands that he stand and walk over to the squad car. Burdine was picked up and placed in the back of Daniels's car. When Officer Emrich arrived, he recognized Burdine and ordered the other officers to transport

him to the Sandusky County jail because Emrich felt that Burdine would not cooperate with standard booking procedures.

Upon arriving at the jail, Burdine again refused the officers' commands to exit the car. He had to be forcibly removed and carried into the jail by Fremont police and Sandusky County sheriff's deputies working at the jail. The officers carried Burdine into the jail's shower room as part of standard procedure for someone who had been pepper sprayed, in order to rinse the pepper spray from Burdine's eyes. According to the officers, who were the only witnesses at the scene, Burdine was placed face-down on the ground so that the handcuffs could be removed, but once they were removed, he resumed actively resisting the officers. Burdine began making martial arts moves and appeared ready to punch the officers. Despite the officers' repeated requests that Burdine stand and enter the shower area, he refused to comply and began to violently swing his arms, kick and bite at the officers. As other officers looked on, a struggle ensued as several officers attempted to regain control of Burdine. Deputy Frank Kaiser grabbed Burdine's right arm and pinned him to the ground by lying on his back, but Burdine's left arm remained free and he swung at the officers. Deputy John C. White meanwhile grabbed hold of Burdine's legs. Burdine reportedly kept chanting, "I hate God" during the struggle. Deputy Sergeant Terry Myers warned Burdine that if he did not calm down, a taser would be applied. When Burdine refused to settle down, Myers applied a taser in drive stun format (without deploying the probes) to the back of Burdine's leg. This appeared to have no effect on Burdine. As he continued to struggle, Myers warned him a second time, but Burdine kicked Deputy White in the chin. Myers applied the taser again, this time to Burdine's lower back. This

again had no apparent effect. Myers then warned Burdine a third time to stop resisting. When Burdine refused to comply, Myers applied the taser a third time, to Burdine's leg. This again had no effect.

At this point, Myers asked Captain Diane Blue to call for an EMT squad to transport Burdine to the hospital because Myers felt that Burdine was not in a condition to be accepted at the jail. Burdine remained face-down on the ground while the officers waited for EMTs to arrive, held in place by Deputy Kaiser. Kaiser eventually succeeded, with the other officers' assistance, in handcuffing Burdine again. At some point, Burdine vomited, causing Kaiser to back away while keeping hold of Burdine's wrists. Burdine grabbed one of Kaiser's fingers and twisted it to the point that Kaiser felt it start to dislocate.

Plaintiffs make arguments on appeal as to Burdine's condition when the EMTs arrived, that is, whether Burdine was at that point conscious and responsive or whether he was unconscious and already dying of asphyxia. EMT Jessica Berlekamp-Crowell noted that Burdine was making bubbles at the mouth and appeared to be breathing, and that his face was dark red. EMT John Griggs determined that Burdine's breathing did not seem unusual, and Burdine's pulse was neither high nor low. Griggs testified that Burdine appeared to be mumbling something incoherent, but might not have been using actual words. Burdine was placed on a backboard and moved into a squad car, by which point his face had changed in color to a purplish blue and he had ceased breathing. En route to the hospital, the EMTs, assisted by Fremont officers, administered CPR and other standard resuscitation techniques in an effort to revive Burdine. By the time they reached the hospital,

Burdine was in cardiac arrest. Further efforts to revive Burdine at the hospital failed, and he was pronounced dead at approximately 4:30 a.m.

An autopsy by Lucas County Deputy Coroner Dr. Cynthia Beisser revealed that Burdine had a purple contusion on the left side of his neck, as well as blood in both sternocleidomastoid muscles (at the sides of the neck) and the adjacent soft tissue. She also noted that the left horn of Burdine's thyroid cartilage was fractured, but concluded that this played no role in Burdine's death. The toxicology report revealed the presence of alcohol, methamphetamines, and marijuana in Burdine's system at the time of death. Beisser also found that Burdine's heart was significantly enlarged and that the myocardium of the left ventricle was abnormally thickened, and she later testified that these conditions left Burdine at increased risk for sudden cardiac arrest and death, a risk that would be further heightened by the consumption of methamphetamines and physical exertion. Beisser concluded that the death was accidental, caused by acute drug intoxication during an episode of excited delirium.

Plaintiffs' medical expert, forensic pathologist Dr. Michael Baden, reached a different conclusion. He reviewed the autopsy and hospital records, numerous depositions (including Dr. Beisser's), toxicology reports, and police reports, and concluded to "a reasonable degree of medical certainty" that Burdine's cause of death was "traumatic asphyxia due to compression of his neck and back while being restrained by police." R.155-1 at 4. Baden classified Burdine's death as a homicide, not an accident. Baden also concluded that Burdine did not die as a result of an episode of excited delirium, but instead died as a result of severe manual compression of the neck causing

asphyxial death, as evidenced by the purplish blue coloration of the face, the injuries to the neck muscles and soft tissues, and the fracture of the thyroid cartilage. Baden noted that Burdine's blood alcohol and methamphetamine blood concentration levels were within the recreational ranges and were much too low to cause death.

Plaintiffs filed suit in federal district court, claiming wrongful death, conspiracy, and a survival action under § 1983 and wrongful death, gross negligence, and negligence under Ohio law. The district court granted the defendants' motion for summary judgment on the grounds of qualified immunity. *Burdine v. Kaiser*, No. 3:09cv1026, 2012 U.S. Dist. LEXIS 55617 (N.D. Ohio Apr. 20, 2012). As a threshold matter, the court held that all of the officers that were "not alleged to have taken any physical action against Burdine . . . are, accordingly, entitled to summary judgment as to the excessive force claim." *Id.* at *13. Turning next to the officers alleged to have taken physical action against Burdine, the court found that each individual officer was entitled to qualified immunity because their actions—physically restraining, pepper spraying, and tasering Burdine—were objectively reasonable under the Fourth Amendment, given Burdine's persistent resistance. *Id.* at *14–19. The district court also noted that plaintiffs had shown no causal link between the actions taken by any of the officers and Burdine's death. The court determined that Dr. Baden's expert report failed to raise a genuine issue of material fact because his theory—which the district court understood to be that Burdine was "either strangled or somehow asphyxiated through pressure to the back"—did not explain the allegedly fatal injuries to Burdine's throat or the coroner's findings of cardiac arrest brought on by drug-induced delirium. *Id.* at *19–20.

With respect to plaintiffs' state-law claims for wrongful death, negligence, and gross negligence, the district court noted that Ohio law grants presumptive governmental immunity to the police, absent certain exceptions. *See* Ohio Rev. Code Ann. § 2744.02(B). To prevail, plaintiffs needed to show that the officers' actions were manifestly outside the scope of their employment or official responsibilities or were undertaken with malicious purpose, in bad faith, or in a wanton or reckless manner. Ohio Rev. Code Ann. § 2744.03(A)(6). For the same reasons that the officers were entitled to qualified immunity under federal law, the district court found their actions were objectively reasonable and that no rational juror could find that the officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner. The court held that all the officers were entitled to governmental immunity on the state-law claims. *Id.* at *22–23.

Plaintiffs now appeal. We review the district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to plaintiffs, the nonmovants, and giving plaintiffs the benefit of all reasonable inferences. *King v. Taylor*, 694 F.3d 650, 661 (6th Cir. 2012).

Each of the officers that took physical action against Craig Burdine is entitled to qualified immunity because plaintiffs have not raised a genuine issue of material fact to show that any officer used excessive force in violation of the Fourth Amendment. Qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether qualified immunity is

proper, we ask, "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine whether Craig Burdine's Fourth Amendment rights were violated, we must examine whether any officer's conduct was objectively unreasonable under the circumstances.

Although plaintiffs contend on appeal that the district court failed to view the facts in the light most favorable to them as the nonmovants, as the court is required to do when deciding a motion for summary judgment, the district court did not err. Plaintiffs claim that the district court improperly disregarded Dr. Baden's expert testimony, which plaintiffs rely on to establish "that [Craig] Burdine was deliberately strangled [by the officers] during the shower room struggle." Plaintiffs' case relies entirely on Dr. Baden's expert report,[1] and the strangulation-by-neck-compression theory derived from it, but the only evidence supporting this theory is Dr. Baden's own opinion. Dr. Baden's opinion is not by itself sufficient to raise a genuine issue of material fact when it relies on his interpretation of other evidence to reach a conclusion—which the strangulation theory depends on—that is beyond his area of expertise, namely, that Craig Burdine was unconscious when EMTs arrived at the jail. No other evidence supports Baden's belief that Burdine was unconscious at that point. In fact, all evidence in the record points to the contrary. Every witness, including the

---

[1] Plaintiffs' counsel emphasized at oral argument that "Our case is Dr. Baden." Oral Arg. at 12:09.

EMTs and law enforcement officers, testified that Burdine was breathing, conscious, and incoherently responsive when EMTs arrived. Dr. Baden's conclusory opinion cannot by itself *create* a genuine dispute of material fact; at best, it could *support* a factual dispute raised by other evidence, which plaintiffs have not provided.

Plaintiffs cannot defeat defendants' motion for summary judgment based solely on Dr. Baden's conclusory opinion in this case. Plaintiffs' case relies entirely on Dr. Baden's expert report, which in turn relies on one piece of physical evidence: the fracture of the decedent's thyroid cartilage and related tissue damage in the neck. Dr. Baden concedes that these injuries do not in and of themselves cause death, but insists that they provide a "shoe print" indicating neck compression. R. 159 at 157–58. He also testified that the neck is a protected area that would not be injured in this way from back pressure; these injuries would require "direct pressure on the neck." *Id.* at 66–67. But Dr. Baden's explanation for Burdine's death fails to comport with the evidence in the record.

Dr. Baden's report is directly contradicted by the account of every law enforcement officer and the two EMTs. The officers and EMTs did not testify that anyone ever manually compressed Craig Burdine's throat, and there is remarkable consistency in their accounts—despite the involvement of two separate police forces, comprising over a half-dozen officers, and an independent two-person EMT squad. Plaintiffs point to no material inconsistencies in their testimony that would help support their theory and lend credence to Dr. Baden's conclusions. In addition, Dr. Baden admitted that someone whose neck was even partially compressed would lose consciousness within two to three minutes, while someone whose neck was completely compressed would lose

consciousness in under ten seconds. Yet when the EMTs arrived, Burdine was conscious, breathing and speaking (albeit incoherently), and had a normal pulse. This evidence is incompatible with the theory of the case plaintiffs advance because if Craig Burdine had died of severe neck compression, he would have been unconscious when the EMTs arrived.

A single expert report that relies on the expert's contrary interpretation of all other evidence does not create a genuine issue of material fact. In *Lewis v. Adams County*, 244 F. App'x 1, 9 (6th Cir. 2007), there was a "clear conflict between the officers' testimony," which indicated that the decedent had raised his arm and pointed a rifle at the officers, and the plaintiff's expert, who stated that it was "highly unlikely" that the decedent could have been pointing a rifle at the officers before they shot and killed him. The plaintiff argued that the district court, in granting summary judgment for defendant officers, ignored conflicting evidence and failed to construe the facts in favor of the nonmovant. *Id.* at 8. This court held:

> The question on appeal is whether the district court properly determined that even though there was a dispute over whether Lewis was pointing his gun at the officers, there was not enough evidence from the plaintiff to send that issue to the jury or whether the district court improperly "weighed" the evidence on summary judgment. We agree with the district court that the plaintiff did not submit enough evidence to get to a jury on the issue of whether Lewis was pointing his rifle at the officers. One expert's opinion that it is "highly unlikely" that Lewis was pointing his rifle at the officers in the face of the consistent deposition testimony from all of the officers at the scene and the opinion of the medical examiner that the physical evidence was consistent with the officers' testimony is simply not enough to take that issue to a jury.

*Id.* at 10. Plaintiffs misread *Lewis* and attempt to distinguish it on the grounds that the expert in that case merely speculated that events could have transpired differently. The expert's report in *Lewis*

clearly conflicted with the police version of events but still did not raise a triable fact issue. The expert was flatly contradicted by consistent testimony from the officers at the scene and the medical examiner's finding that the physical evidence corroborated the officers' story. Similarly here, Dr. Baden's conflicting expert report is not enough, without more, to raise a triable fact issue requiring jury resolution.

Plaintiffs cite *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012), in support of their position that summary judgment is inappropriate here, arguing that this case is like *King* because there are two theories of what happened, each supported by some evidence. Plaintiffs misconstrue the relevance of *King* to this case. In *King*, the key disputed factual issue was whether the decedent had pointed a gun at the defendant officers at the time he was shot and killed. This court reversed the district court's finding of qualified immunity because the officers' testimony that the decedent had pointed a gun at them was unsupported by any other evidence, and was contradicted not only by the opinion of two medical experts, but also by a common sense reading of the physical evidence. The court noted that the trajectory of the bullet, as well as the position of the decedent's arm after being shot, were plainly inconsistent with the officers' account of what transpired. We held:

> In our view, a jury could find, based upon the forensic evidence, expert testimony, and common sense, that King did not threaten the officers by pointing a gun at them just before he was shot. . . . Even without the further opinion of plaintiffs' expert regarding the position of King's arm just before he was shot, the *jury could draw on its common sense and experience*, along with the expert testimony regarding what happens to one's body once the medulla oblongata is perforated, to determine that King did not point a gun towards the officers just before he was shot.

*Id.* at 662–63 (emphasis added). *King* presented two distinct theories of what transpired, one supported by the bare allegations of the defendant officers, and the other supported by expert opinions *corroborated by* a common-sense reading of the unequivocal physical evidence. In this case, by contrast, plaintiffs present a theory that is supported only by Dr. Baden's expert opinion, which is not only uncorroborated by the physical evidence but which fails to explain several crucial aspects of the record. *King* is therefore distinguishable and does not support plaintiffs' position.

Because there is insufficient evidence to support plaintiffs' strangulation theory, plaintiffs have not provided evidence sufficient for a reasonable juror to find that Craig Burdine's constitutional rights were violated. The defendants are therefore entitled to qualified immunity under the first step of the *Saucier* test, and for that reason, they are entitled to summary judgment with respect to plaintiffs' § 1983 claim.

On the issue of bystander officer liability, the district court did not discuss Sixth Circuit precedents establishing that a bystander officer can be liable if he or she observes an act of excessive force by another officer, has the means and opportunity to intervene, and fails to do so. *See, e.g.*, *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982). However, the district court properly granted summary judgment for the bystander officers here because the officers who took physical action against Craig Burdine did not use excessive force.

The district court also properly granted defendants' motion for summary judgment with respect to plaintiffs' state-law claims for wrongful death, negligence, and gross negligence, because those claims are foreclosed by our holding that the defendants did not act unreasonably under the

Fourth Amendment. Under Ohio law, political subdivisions and their employees are immune from civil liability for "actions seeking 'to recover damages for injury, death or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function' in certain circumstances." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 (6th Cir. 2005) (quoting Ohio Rev. Code Ann. § 2744.03(A)). There are exceptions for when a government employee acts beyond the scope of his or her employment, with malicious purpose, in bad faith, or in a wanton or reckless manner, *see id.* at 315–16, but for the reasons given above with respect to federal qualified immunity, these state-law exceptions do not apply here. As we reasoned in *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009):

> Based on the same analysis [finding no Fourth Amendment violation], we conclude there are no genuine issues of material fact and that defendants are similarly entitled to immunity from liability in connection with plaintiff's claims under state law. Inasmuch as plaintiff has failed to demonstrate that defendants' conduct was objectively unreasonable, it follows that she has also failed to demonstrate that defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner," such as is required to avoid statutory immunity under Ohio law.

*Id.* at 916 n.3 (quoting Ohio Rev. Code Ann. § 2744.03(A)(6)(b)). Therefore, because the officers in this case acted reasonably under the Fourth Amendment, they are entitled to statutory immunity under Ohio law because they did not act outside the scope of their employment, with malicious purpose, in bad faith, or in a wanton or reckless manner.

The district court's judgment is affirmed.