RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0326p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ALLEN KING and BRUCE KING,
Administrators of the Estate of Roger King,
                    *Plaintiffs-Appellants*,

                                                    No. 11-5917

          *v.*

ERIC TAYLOR, in his individual capacity as a
Kentucky State Trooper,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:10-cv-96—Karl S. Forester, District Judge.

Argued: July 17, 2012

Decided and Filed:  September 12, 2012

Before:  SUTTON and GRIFFIN, Circuit Judges; and DOWD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Hans G. Poppe, THE POPPE LAW FIRM, Louisville, Kentucky, for Appellants. Morgain M. Sprague, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Garry R. Adams, CLAY FREDERICK ADAMS PLC, Louisville, Kentucky, for Appellants. Christian Matthew Feltner, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee.

_____

[*]The Honorable David D. Dowd, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  This case involves the shooting death of Roger King by Kentucky State Trooper Eric Taylor.  Taylor, along with officers from the Sheriff's Office for Boyle County, Kentucky, were attempting to arrest King at his home.  Taylor alleges that he shot and killed King in self-defense and/or in defense of his fellow officers.  The administrators of King's estate brought this action, asserting claims against Taylor under the Fourth Amendment and Kentucky state law.  The district court dismissed the action for lack of proper service and, alternatively, entered summary judgment in Taylor's favor on the merits.  Because these rulings were error requiring reversal, we vacate the judgment of the district court and remand for further proceedings.

I.

On November 25, 2009, the Sheriff's Office for Boyle County, Kentucky, received an arrest warrant and emergency protective order for Roger King.  King had allegedly entered onto his ex-wife's property, pulled a gun from his pocket, pointed it at his ex-wife's face, and said "I'm going to kill someone today."  The sheriff was commanded to arrest King on felony and misdemeanor charges stemming from the altercation.  The protective order prohibited King from coming within 1,000 feet of his ex-wife or her household and ordered him to appear in court the following week.

Sheriff's deputy Jody Adams was tasked with executing the warrant and serving the protective order.  The sheriff told Adams that he saw King the week before, and that King had been acting "strange [and] violent" toward him.  He told Adams to obtain the assistance of the Kentucky State Police.  Adams was aware that King, years earlier, had been involved in an incident with the Kentucky State Police in which King allegedly fired shots in the vicinity of a state trooper who entered onto King's property.  King was eventually arrested for his actions.

Adams recruited fellow sheriff's deputy Alfred Isaacs to assist in the arrest. Isaacs contacted Kentucky State Trooper Frank Thornberry directly, who advised that he was off for the night, and that Isaacs should contact Trooper Eric Taylor, which Isaacs did. Adams, too, contacted the Kentucky State Police dispatch office to ask for assistance. Taylor was dispatched. Taylor was informed that the situation could become dangerous in light of the allegations and was told about the earlier incident between King and the state trooper. While speaking with the dispatch operator, Taylor made the following statements with respect to King: "So, my thought . . . was, there shouldn't be no [Emergency Protective Order] on that guy. And [Frank Thornberry] said, well, what do you mean? I said, you don't serve an EPO on dead people. You know?"; "either [King will] be home (a); (b) he'll be home and come out shooting, you know; or (c) he'll come out, and—yeah, and one of us will have to kill—shoot him."; "If I did [shoot him], I don't care to be off. I'll be off until after the first of the year."; and "Well, if you don't get a hold of me [later tonight], then it may be I'm busy shooting bullets or something."

Taylor, Adams, Isaacs, and three other deputies from Boyle County arrived at King's home around 9:00 p.m. and aimed their headlamps and spotlights towards the front of the home. Adams approached and knocked on the front door, but no one answered. Isaacs joined Adams, and the two went to a side door and knocked, but again, no answer. Isaacs went to the back of the home, and Taylor covered him with his rifle. Through two glass doors, Isaacs saw King lying on his couch in his underwear, with a blanket partially covering him. The couch faced the glass doors. Taylor signaled to Adams, and Adams joined Taylor and Isaacs on the back porch.

Isaacs and Adams approached the window; Taylor provided cover. Both men knocked on the glass door and announced their identities. Isaacs pressed the badge on his uniform sleeve up to the glass to show King he was a law enforcement officer. Taylor stood to the right of Isaacs and Adams, holding his rifle with the stock against the inside of his shoulder and the muzzle lowered just slightly, ready to aim and shoot if necessary. According to Taylor, King sat up, turned toward the officers and gave a "look of . . . contempt." King then turned away from the window. Taylor saw King's

back and both of his elbows.  King turned back toward the officers, and Taylor saw King's right hand come up with a gun and point it directly at the officers.  Taylor raised his rifle and shot at King's midline.  As discussed below, forensic evidence and expert testimony tell a different story.

The window shattered, and Adams, Isaacs, and Taylor fled for cover.  It was later discovered that Taylor's bullet had struck King in the face, killing him instantly.  A medical examiner for the Commonwealth of Kentucky performed an autopsy and determined that King died from a "projectile perforation of [his] medulla oblongata."

Plaintiffs are the administrators of King's estate.  They filed this action against the Commonwealth of Kentucky and Eric Taylor, in both his individual and official capacities.  Suing under 42 U.S.C. § 1983, they claimed that Taylor's use of deadly force against King was unwarranted and thereby violated King's rights under the Fourth and Fourteenth Amendments.  They also asserted that Taylor assaulted, battered, and acted negligently toward King by shooting him.  Finally, they alleged that the Commonwealth was vicariously liable for Taylor's negligence and directly liable for failing to train him in the proper use of force.

Early in the proceedings, the Commonwealth and Taylor, in his official capacity, moved to dismiss all claims against them on the basis of sovereign immunity.  Plaintiffs responded by voluntarily dismissing these claims without prejudice.  *See* Fed. R. Civ. P. 41(a)(1)(A)(i).  The same day he moved to dismiss the claims in his official capacity, Taylor answered the complaint in his individual capacity.  He asserted in his answer that the complaint should be dismissed, among other reasons, because of insufficient service of process.

Nearly a year after he answered the complaint, Taylor filed a motion asking the district court to dismiss the action for insufficient service of process, *see* Fed. R. Civ. P. 12(b)(5), (i), and, alternatively, to enter summary judgment on the merits in his favor, *see* Fed. R. Civ. P. 56(a).  Plaintiffs opposed the motion.  They did not dispute that they improperly served Taylor, but argued that Taylor had waived his challenge to service.  They also argued that, even if Taylor's challenge were preserved, the court should

extend the time to serve him under Federal Rule of Civil Procedure 4(m), even though plaintiffs could not show good cause for their failure to timely serve him. *See, e.g.*, *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340–41 (7th Cir. 1996). Plaintiffs argued that dismissing the complaint instead of giving them more time to properly serve Taylor would be draconian, as a subsequent action would be barred by the statute of limitations. The district court ruled that Taylor had not waived his defense and declined to exercise its discretion to extend the time for service. It also ruled that Taylor was entitled to summary judgment on the merits.

Plaintiffs timely appealed.

## II.

We must first consider the district court's ruling on Taylor's service defense, for without proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999); *see Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). And in the absence of personal jurisdiction, a federal court is "powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks omitted).

Plaintiffs chose to sue Taylor in his official and individual capacities. A summons was addressed to Taylor, "[care of] Morgain Sprague," an attorney with the Office of the Kentucky State Police Legal Counsel who later represented the Commonwealth and Taylor in both capacities. The summons and a copy of the complaint were mailed to Sprague and signed for by someone in her office. Although this method of service was apparently sufficient to confer personal jurisdiction over Taylor in his official capacity—service was never challenged—it did not confer jurisdiction over him in his individual capacity. *See Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1988) (per curiam). Taylor's full awareness that he had been sued makes no legal difference to the question whether he was properly served. *See Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir.

1991).[1] Plaintiffs concede their failure to properly serve Taylor. They seek to avoid the consequences of that failure by arguing that Taylor waived his ability to challenge the service in three different ways. We address each theory separately.

A.

First, plaintiffs contend that Taylor waived his defense by not including it in his first motion to dismiss. By operation of the Federal Rules of Civil Procedure, a defendant who files a motion under Rule 12, yet fails to raise in that motion the defense of insufficient service of process, forever "waives" that defense. Fed. R. Civ. P. 12(b)(5), (g)(2), (h)(1)(A). Therefore, if Taylor filed a motion under Rule 12, but never argued therein that service was defective, he is barred from raising the issue later, and plaintiffs' first theory of waiver must be sustained.

Taylor did, in fact, make a Rule 12 motion and omitted from it a challenge to the service of process. However, the motion was made expressly in Taylor's *official capacity*. Therefore, it was effectively *the Commonwealth's* motion. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [of which a governmental officer is

---

[1]The Federal Rules of Civil Procedure provide a very specific method for apprising a defendant of a lawsuit and conferring a court's jurisdiction over him. *See* Fed. R. Civ. P. 4. That method was not followed here. We do not have the option of looking past that failure, even though it was harmless in light of Taylor's full awareness of the lawsuit.

Separately, Judge Griffin notes that strict enforcement of Rule 4's technical requirements for service of process, despite the absence of any prejudice to the defendant from non-compliance, is nonsensical and needlessly elevates form over substance. Other jurisdictions have adopted more progressive, harmless-error-type rules in this context. *See, e.g.*, Mich. Ct. R. 2.105(J)(3) ("An action shall not be dismissed for improper service of process unless the service failed to inform the defendant of the action within the time provided in these rules for service."); *see also, e.g.*, Mich. Ct. R. 1.105 ("These rules are to be construed to secure the just, speedy, and economical determination of every action and *to avoid the consequences of error that does not affect the substantial rights of the parties.*" (emphasis added)). Judge Griffin encourages the Advisory Committee on Civil Rules to adopt a rule, similar to Michigan's, that avoids the wasted resources that litigating harmless errors in service tends to create. Until then, however, courts must apply the service rules as they exist today. *Cf. Tuke v. United States*, 76 F.3d 155, 157 (7th Cir. 1996) ("The Supreme Court insists that federal judges carry out the rules of procedure, whether or not those rules strike the judges as optimal."). Although Rule 4(m), as most of our sister circuits have construed it, permits a district court in its discretion to look past earlier service blunders and give the plaintiff another opportunity to effect proper service, *see Panaras*, 94 F.3d at 340–41, the lack of prejudice to the defendant is only one factor among many that a court may consider in deciding whether or not to do so. *See Troxell v. Fedders of N. Am., Inc.*, 160 F.3d 381, 383 (7th Cir. 1998). Judge Griffin believes that a harmless-error rule that focuses solely on the prejudice suffered by a defendant due to technical defects in service would go further to avoid unwarranted dismissals and thereby conserve judicial resources and promote confidence in our judicial system.

an agent].").  Moreover, the substance of the motion made clear that it was filed only in Taylor's official capacity, for it sought dismissal of all claims against him on the basis of sovereign immunity, a defense that applies to persons only when sued for damages in their official capacity.  *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 765 (6th Cir. 2010).  Because Taylor, in his individual capacity, did not initially file a motion to dismiss, he was permitted under Rule 12(h) to preserve his service defense by including it in his answer, which he did.  *See* Fed. R. Civ. P. 12(h)(1)(B).

B.

Second, plaintiffs argue that Taylor failed to preserve his challenge to service by not pleading it in his answer with sufficient specificity.  This theory fares no better.  As his ninth stated defense, Taylor asserted:  "The Complaint should be dismissed due to insufficient service of process."  That is adequate to preserve the defense under Rule 12(h)(1)(B)(ii).  *See Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 307 (2d Cir. 2002) ("[T]o preserve the defense of lack of personal jurisdiction, a defendant need only state the defense in its first responsive filing and need not articulate the defense with any rigorous degree of specificity."); *compare United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 880, 882 (Fed. Cir. 1997) (defendant's assertion in his answer that the complaint was "barred because of insufficient service of process" was adequate to preserve the defense at the outset); *and Holzsager v. Valley Hosp.*, 646 F.2d 792, 795–96 (2d Cir. 1981) (answer's assertion that the district court "lacked jurisdiction over the person of the defendant" was sufficient under Rule 12(h)(1) to preserve a personal-jurisdiction defense based on constitutional concerns); *with Santos v. State Farm Fire & Cas. Co.*, 902 F.2d 1092, 1095–96 (2d Cir. 1990) (statement in answer that the court lacked *personal jurisdiction* over the defendant did not preserve the separate defense of *insufficient service of process*).

An answer is no place to lay out the detailed basis for a Rule 12(b) defense.  *Cf. Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 718 (6th Cir. 2012) ("The filing of an answer is, after all, the main opportunity for a defendant *to give notice of* potentially dispositive issues to the plaintiff." (emphasis added)).  Details and arguments

are what *motions* are for. Rule 12(h)(1)(B) appears to recognize this point, for it requires a defendant to either (i) "make" an insufficient-service defense in a pre-answer motion or (ii) simply "include" the defense in the answer. The rule gives a defendant the option to preserve the defense in either manner, provided he has not already filed a motion under Rule 12 that did not assert the defense. Requiring motion-like argument in an answer would eliminate the option the rule provides.

Certainly a defendant must develop an argument with facts and legal analysis once he affirmatively challenges a plaintiff's attempts at service. Raising the challenge in a perfunctory fashion will not do. *See O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1400 (7th Cir. 1993); *Photolab Corp. v. Simplex Specialty Co.*, 806 F.2d 807, 810 (8th Cir. 1986); *see also* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1353, at 341 (3d ed. 2004) ("The objection to insufficiency of process or its service should point out specifically in what manner the plaintiff has failed to satisfy the requirements of the service provision that was utilized."). But Taylor did that here in his motion for summary judgment. That was sufficient under the Rules.[2]

Also, that the defense was listed along with a number of others that, according to plaintiffs, are "seen as a matter of course in nearly every answer[,]" cannot render the defense any less properly preserved under Rule 12(h)(1). Plaintiffs' counsel had a duty to study Taylor's answer when it was filed. Had he done so, he would have reviewed his service efforts and recognized them to be unsuccessful. If the defect in service were not immediately apparent to counsel, he could have served Taylor with interrogatories requesting the factual and legal bases for the defense. Or, he could have moved to strike the defense as insufficiently pled, *see* Fed. R. Civ. P. 12(f), which undoubtedly would

---

[2]Technically speaking, it is improper to raise a challenge to service of process in a motion for summary judgment because the defense "involves a matter in abatement and does not go to the merits of the action[.]" *United States v. Marple Cmty. Record, Inc.*, 335 F. Supp. 95, 101 (E.D. Pa. 1971). Nevertheless, when the defense has been preserved in an answer and is later raised in a pre-trial motion, a court will look past the label chosen by the movant and treat the motion as a request for a ruling on the defense made under former Rule 12(d), restyled in 2007 as Rule 12(i). *See id.*; *see also* 5B Wright & Miller, *supra*, § 1353, at 340; *cf. Mich. Surgery Inv., LLC v. Arman*, 627 F.3d 572, 578 (6th Cir. 2010) (Batchelder, C.J., concurring) ("The physicians' motion was not a motion for summary judgment, regardless of the title chosen by the physicians[.]"); *cf. also Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978) (considering the substance of a motion, rather than its label, to determine whether it was one to dismiss or one for summary judgment).

have brought the error to the fore, or asked Taylor to waive service under Civil Rule 4(d), which, had Taylor agreed, would have mooted the issue.  Taylor satisfied Rule 12(h)(1).

C.

We find plaintiffs' third theory meritorious.  They argue that Taylor forfeited his service defense through his extensive participation in the litigation.  We agree.  Even where a defendant properly preserves a Rule 12(b) defense by including it in an answer, he may forfeit[3] the right to seek a ruling on the defense at a later juncture through his conduct during the litigation.  *See Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 60 (2d Cir. 1999); *see also Creech v. Roberts*, 908 F.2d 75, 84 (6th Cir. 1990) (Guy, J., dissenting) (noting that Rule 12(h) "sets only the outer limits of waiver; it does not preclude waiver by implication." (citation and internal quotation marks omitted)), *overruled on state-law grounds by Goldstein v. Christiansen*, 638 N.E.2d 541 (Ohio 1994).  Asserting a Rule 12(b) defense in an answer "do[es] not preserve the defense in perpetuity." *Burton v. N. Dutchess Hosp.*, 106 F.R.D. 477, 481 (S.D.N.Y. 1985).  A defendant is "required at some point to raise the issue by motion for the court's determination." *Id.*  Waiting too long to do so can forfeit the defense.

The majority of cases involving forfeiture of a defense listed in Rule 12(b) involve a personal-jurisdiction defense, not a service defense.  The two defenses, though related, involve distinct concepts.  *See Omni Capital Int'l*, 484 U.S. at 104 ("Service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." (quotation marks omitted)); *see also* Fed. R. Civ. P. 12(b) (listing the defenses separately); 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1353, at 338 (3d ed. 2004) ("Although the questions of personal jurisdiction and service of process

---

[3] While proper to speak in terms of "waiver" when discussing a defendant's failure to preserve a defense in the way Rule 12(h)(1) requires (since the rule itself employs the term), when considering whether a defendant has unintentionally lost the defense through his delay and participation in the litigation, the issue is more properly considered one of "forfeiture." *See Hamilton*, 197 F.3d at 61; *see also United States v. Olano*, 507 U.S. 725, 733 (1993) (noting that "waiver is the intentional relinquishment or abandonment of a known right" (citation and internal quotation marks omitted)).

are closely interrelated, service of process is merely the means by which a federal court gives notice to the defendant and asserts jurisdiction over him; the actual existence of personal jurisdiction should be challenged by a Rule 12(b)(2) motion"). That is why raising a challenge to one will not automatically raise (or preserve) a challenge to the other. *See Santos*, 902 F.2d at 1095.

We recently clarified the test for finding forfeiture of a personal-jurisdiction defense through conduct: we ask whether a defendant's conduct prior to raising the defense has given the plaintiff "a reasonable expectation" that the defendant will defend the suit on the merits or whether the defendant has caused the court to "go to some effort that would be wasted if personal jurisdiction is later found lacking." *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011) (quoting *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)). We consider all of the relevant circumstances. *Hamilton*, 197 F.3d at 61. Recognizing that service of process is simply the means by which a defendant receives notice of an action and is formally brought within a court's jurisdiction, whereas personal jurisdiction concerns the fairness of requiring a defendant to appear and defend in a distant forum, we agree with the Second Circuit that, as between the two defenses, it is relatively easier to find forfeiture of a service defense. *See id.*, 197 F.3d at 60; *Datskow v. Teledyne, Inc.*, 899 F.2d 1298, 1303 (2d Cir. 1990).[4]

We review a district court's ruling on forfeiture for an abuse of discretion. *See Ziegler Bolt & Parts*, 111 F.3d at 882; *accord Lechoslaw v. Bank of Am., N.A.*, 618 F.3d 49, 55–56 (1st Cir. 2010); *Melton v. Wiley*, 262 F. App'x 921, 923 n.5 (11th Cir. 2008)

---

[4]The Second Circuit put it this way:

> [T]his is not a case where a defendant is contesting personal jurisdiction on the ground that [long-arm] jurisdiction is not available. We would be slower to find waiver by a defendant wishing to contest whether it was obliged to defend in a distant court. But here amenability of Teledyne Industries, Inc. to the jurisdiction of the Western District is clear, and defendant is complaining only about a defect in the form of service, one that could have been readily cured during the limitations period if defendant had promptly complained.

*Datskow*, 899 F.2d at 1303; *see Hamilton*, 197 F.3d at 60 ("Since Atlas's jurisdictional defense challenges the application of New York's long-arm statute, we approach the waiver issue with the enhanced caution that *Datskow* contemplated.").

(per curiam); *Hamilton*, 197 F.3d at 60; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (discussing the inherent powers of federal courts to govern conduct in actions pending before them); *cf. Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 506 (6th Cir. 2005) (district court's allowance of an untimely affirmative defense is reviewed for an abuse of discretion); *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997) (same).[5] "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 678 F.3d 409, 416 (6th Cir. 2012). Such review suggests "a range of plausible assessments" about the question considered. *Ohio ex rel. Skaggs v. Brunner*, 629 F.3d 527, 532 (6th Cir. 2010). Though it is certainly deferential, "abuse of discretion review is not the same thing as a rubber stamp[.]" *Dunphy v. McKee*, 134 F.3d 1297, 1300 (7th Cir. 1998).

Despite the absence of any legal error or clearly erroneous findings of fact, we conclude that Taylor's forfeiture in this case was so clear that the district court abused its discretion in ruling otherwise. After including the service defense in his answer, Taylor was completely silent about it until the summary judgment stage. During that span of silence, Taylor, solely in his individual capacity, participated extensively in the litigation for over a year in the following ways:

- Meeting with plaintiffs' counsel and then filing with the district court a joint report under Civil Rule 26(f).[6]

---

[5] *Gerber* does not require de novo review of forfeiture rulings. There, we considered anew whether the defendant had forfeited its personal-jurisdiction defense through its conduct. 649 F.3d at 517–20. But we presumably did so because the plaintiff's claim of forfeiture was raised for the first time on appeal, which precluded review of any exercise of discretion. *See Gerber v. Riordan*, No. 3:06-cv-01525, 2009 WL 1505572 (N.D. Ohio May 28, 2009) (not addressing forfeiture allegation). Moreover, because the defendant never appeared or filed a brief in the appellate proceedings, there was no contention either that the plaintiff itself had forfeited its argument on forfeiture by not raising it below or that the matter should be remanded so the district court could exercise its discretion. *See Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 490 (6th Cir. 2008). *Gerber* did not establish the review standard for forfeiture rulings. *Cf. United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) ("Cases implicating issues that 'merely lurk in the record, neither brought to the attention of the court nor ruled upon,' do not establish binding precedent on the unexamined point." (citation omitted)).

[6] Civil Rule 26(f) contemplates a conference between the parties in which consideration of "the nature and basis of their claims *and defenses*," among other things, are considered. Fed. R. Civ. P. 26(f)(1) (emphasis added).

- Voluntarily participating in full discovery on the merits, including making initial disclosures under Rule 26(a), responding to written discovery requests from plaintiffs, giving his deposition, having counsel attend the depositions of sheriff's deputies Alfred Isaacs and Jody Adams, and retaining Dr. Gregory Davis as an expert witness and defending his deposition.

- Moving to amend the scheduling order to extend the deadline for expert witness disclosures.

- Joining plaintiffs' request to extend discovery by sixty days to allow plaintiffs time to depose Taylor and others, and filing a status report urging the court to sustain the parties' joint motion for an extension.

- Attending a status conference to discuss the progress of the action and the justification for extending the pretrial deadlines.

Such voluntary, active, and extensive participation in the litigation indisputably gave plaintiffs a "reasonable expectation that [Taylor would] defend the suit on the merits." *Gerber*, 649 F.3d at 519. In addition, Taylor's decision to wait until the summary judgment stage to seek a ruling on his service defense caused the district court to go to at least "some effort that would be wasted if [proper service of process] is later found lacking." *Id.* He therefore forfeited his service defense.[7] The district court's ruling to the contrary fell outside the "range of plausible assessments" on the matter and was thus an abuse of discretion. *Brunner*, 629 F.3d at 532; *cf. Datskow*, 899 F.2d at 1301, 1303 (finding that the defendant forfeited its defense of improper service by including the defense in its answer and then waiting four months to raise the defense in a motion, before which time it attended a scheduling conference where the defense was never mentioned).

---

[7]The written appearance filed by Taylor's counsel one month before Taylor moved for dismissal on the basis of lack of service does not constitute forfeiture. *See Friedman v. Estate of Presser*, 929 F.2d 1151, 1157 n.7 (6th Cir. 1991) (noting that an appearance by counsel, filed after properly raising lack of proper service in the first responsive pleading, did not waive the defense). Insofar as some of our more recent cases might suggest otherwise, *see, e.g.*, *Gerber*, 649 F.3d at 520, they must yield to *Friedman*. *See United States v. Simpson*, 520 F.3d 531, 539 (6th Cir. 2008) (noting that the earlier of two conflicting panel holdings controls).

At oral argument, Taylor's counsel admitted that for "tactical reasons" she did not bring a motion to dismiss at an earlier stage in the litigation. Counsel intentionally waited until after the statute of limitations had run before filing her motion. In assessing whether Taylor forfeited his defective-service defense through his active and extensive participation in the litigation, the deliberativeness of his conduct, for gamesmanship purposes, weighs against Taylor.

In finding forfeiture here, we do not imply that a defendant who believes he has been improperly served and insists upon proper service must raise the issue in a motion at the earliest possible moment upon pain of forfeiture. Such a rule would contravene Rule 12(h). And, given that a plaintiff has 120 days to serve a defendant, *see* Fed. R. Civ. P. 4(c)(1), (m), a motion to dismiss on the basis of improper service made during the period for service may properly be denied as premature. *See McGinnis v. Shalala*, 2 F.3d 548, 551 (5th Cir. 1993) (per curiam); *see also Henderson v. United States*, 517 U.S. 654, 661 (1996) ("[Rule 4(m)'s] 120-day provision operates not as an outer limit subject to reduction, but as an irreducible allowance."). Taylor, however, waited until well after the 120-day period expired to press his service defense in a motion and, in the meantime, took substantial steps to defend the case on the merits. Doing so forfeited his defense. We turn to the merits.

## III.

The district court granted Taylor summary judgment on his defenses to plaintiffs' claims of excessive force under the Fourth Amendment, as well as assault, battery, and negligence under Kentucky law. *See* Fed. R. Civ. P. 56(a). We review that decision de novo. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). In so doing, we view the facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

IV.

A.

Plaintiffs sued Taylor for damages under 42 U.S.C. § 1983, which permits an individual to bring a private right of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or federal statutes.  Taylor seeks to avoid liability by invoking the affirmative defense of qualified immunity.   This defense "shields government officials performing discretionary functions from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. 2011) (citation, internal quotation marks, and ellipsis omitted).  In determining whether a defendant is entitled to qualified immunity, we make two inquiries:  (1) taken in the light most favorable to plaintiffs, do the facts show that the officer's conduct violated a federal right, and (2) was the right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful.  *Id.*

The parties agree that the federal right at issue here is the right, secured by the Fourth Amendment, to be free from excessive force during an authorized seizure.  It is undisputed that Taylor "seized" King by shooting him, thereby triggering the Fourth Amendment's "reasonableness" requirement. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."); *see also Ciminillo v. Streicher*, 434 F.3d 461, 465–66 (6th Cir. 2006).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and some internal quotation marks omitted).  In *Garner*, the Supreme Court held that the reasonableness of using deadly force to subdue a suspect depends upon whether "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer

or to others."  471 U.S. at 11; *see Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005).

B.

The district court determined that plaintiffs could not establish a constitutional violation.  Despite the existence of forensic evidence and expert testimony calling into serious question the officers' account of the incident—particularly the question whether King pointed a gun at the officers just before being shot—the district court determined that this evidence does not create a *genuine* factual dispute that requires a trial.  We disagree.  Viewing the record in the light most favorable to plaintiffs, we conclude that a factual dispute exists whether Taylor reasonably believed that King posed a threat of serious physical harm to Taylor or the other officers.  In our view, a jury could find, based upon the forensic evidence, expert testimony, and common sense, that King did not threaten the officers by pointing a gun at them just before he was shot.

The officers unequivocally testified that King pointed a gun at them while facing them.  Isaacs said that he saw King "looking right at [him]" while the gun was on its way around toward him.  Adams stated that King was "looking toward the door . . . at Deputy Isaacs."  Because Taylor was standing to the right of Isaacs and Adams, if the officers are believed, the bullet should have entered the left side of King's face and traveled to the right.  And, because King was seated and therefore at a lower position than Taylor, who was standing, the bullet should have traveled slightly downwards through King's head.  (The photograph at R.32-12, Page ID: 343, demonstrates the point.  Taylor was standing in front of the blown-out window, while Isaacs and Adams stood to his left.)  But the bullet did not take this path.  According to the autopsy report, the bullet entered the *right side* of King's face and traveled two and one-half inches *to the left*, and three inches *upward*.  The path is consistent with King being in a reclined position looking straight ahead (not at the officers) when shot, rather than sitting up and looking toward them, as the officers claim.  This body position is further consistent with plaintiffs' theory that King was shot while lying on his couch, not making any threatening gestures towards the officers.

In addition, the officers' testimony that King was pointing a gun at them just before he was shot is called into genuine dispute by expert testimony. After he was killed, King was found with a gun in his right hand, which was resting on his right hip. While the presence of a gun in King's right hand is consistent with the officers' testimony, that it was found resting on his right hip decidedly is not. Isaacs said he saw King point the gun at him just before he (Isaacs) turned to avoid being shot in the face. Adams, who was standing next to Isaacs, also said he saw King point a gun towards Isaacs. Taylor said he fired his rifle just when he saw King "get[] in front of [him]" and "point[] [a gun] at [him]." Moreover, the officers (including Taylor) said they believed at first that King might have *shot at them*. They could have plausibly believed this only if King had his gun pointed directly at them, which would have required King to have his right arm extended toward the officers, somewhat parallel to the floor.[8] But a jury could find such arm positioning entirely inconsistent with expert testimony and common sense. Two medical experts opined that, due to the bullet's severing of King's medulla oblongata, once shot, King immediately would have lost consciousness, causing his entire body to become unresponsive and flaccid. In that case, gravity would have caused King's outstretched right arm to fall to the floor, not neatly into his lap. Indeed, this sequence of events is consistent with the testimony of plaintiffs' expert that "it is highly unlikely that Mr. King's right arm was extended toward the officers at the time of injury," as it was found resting on his right hip instead of the ground.

What exactly happened just before King was shot is a question for the jury, as both sides' theories of what transpired are sufficiently supported by evidence in the record. Even without the further opinion of plaintiffs' expert regarding the position of King's arm just before he was shot, the jury could draw on its common sense and experience, along with the expert testimony regarding what happens to one's body once the medulla oblongata is perforated, to determine that King did not point a gun towards

---

[8]Taylor believes that whether King's right arm was extended is "irrelevant" to whether he pointed the gun at the officers. We disagree, for a jury could use its common sense to find that it would be nearly impossible, based upon the way King's body was positioned on the couch, for him to point a gun at the officers unless his right arm was extended.

the officers just before he was shot, thereby rendering Taylor's use of deadly force unreasonable.[9]

Our decision in *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989), relied upon by plaintiffs but distinguished by the district court, supports our conclusion. There, the defendant officer testified that he shot the plaintiff's husband because the husband had pointed his weapon directly at officers in a threatening manner. *Id.* at 215. We concluded that a jury could find otherwise, based upon expert testimony that the "position of the [husband's] body after death indicated that the right hand was not grasping the trigger and that the position of the left arm could not prove that [the husband] was aiming his weapon at the officers." *Id.* The same is true here. The district court discounted the persuasiveness of *Brandenburg* on the basis that, apparently unlike in this case, *Brandenburg* involved "actual physical evidence that [the decedent] did not have his finger on the trigger of the gun and was not aiming it at the officers when he was shot." This distinction is dubious. The "actual physical evidence" supporting the plaintiff's theory in *Brandenburg* is no stronger than plaintiffs' evidence here. And, as in *Brandenburg*, expert testimony and common sense could lead a jury to reject the officers' testimony that King was pointing a gun at them when Taylor shot him.

With respect to the second question in the qualified-immunity analysis, we have little trouble concluding that if Taylor shot King while he was lying on his couch and not pointing a gun at the officers, Taylor violated King's clearly-established right to be free from deadly force. It has been clearly established in this circuit for some time that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Ciminillo*, 434 F.3d at 468; *see Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991); *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988). Genuine disputes of material fact preclude upholding the district court's entry of summary judgment on Taylor's defense of qualified immunity. *See Bletz*, 641 F.3d at 749 ("[I]f genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established

---

[9]Taylor defends his actions solely on the basis that King pointed the gun at the officers.

right, then summary judgment [on the defense of qualified immunity] is inappropriate."); *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988).

V.

The district court also entered summary judgment on plaintiffs' state-law claims of assault and battery on the basis that Taylor was entitled to a full defense under Kentucky's justification and immunity statutes. *See* Ky. Rev. Stat. §§ 503.070(2), 503.085(1). The statutes work in tandem in a civil suit. First, the justification statute provides that the use of deadly force is justifiable when the individual "believes that such force is necessary to protect himself against death, serious physical injury, . . . [or a] felony involving the use of force[.]" *Id.* § 503.050(2). It also permits the use of deadly force where an individual "believes that such force is necessary to protect *a third person* against the use or imminent use of unlawful physical force by [another]" and the individual believes "that the person whom he seeks to protect would himself have been justified" in using deadly force. *Id.* § 503.070(2) (emphasis added). Second, if an individual's use of deadly force is justified under either provision—self-defense or defense of a third person—he is "immune . . . from civil action for the use of such force[.]" *Id.* § 503.085(2).

For the same reasons we find genuinely disputed the facts underlying the question whether Taylor had probable cause to use deadly force to seize King, we find genuinely disputed whether Taylor believed such force was necessary to protect himself or another from death or serious physical injury. Summary judgment on Taylor's defense of immunity under state law, therefore, is not appropriate.

VI.

Finally, the district court granted Taylor summary judgment on plaintiffs' negligence claim on the basis of qualified official immunity and lack of proximate cause.

Under Kentucky law, qualified official immunity affords protection to public officers sued in their individual capacity from "damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522

(Ky. 2001). Specifically, the defense "applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (internal citation omitted). "Bad faith" "can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness." *Id.* at 523. This standard is materially similar to the one a plaintiff must meet to overcome a federal defense of qualified immunity.

Just as Taylor's defense of qualified immunity on the federal claim requires a jury to resolve underlying disputed facts, so too with respect to Taylor's defense of qualified official immunity on plaintiffs' negligence claim.[10] The same is true also with respect to Taylor's defense that a superseding cause—King's alleged criminal act of pointing a gun at the officers—severs Taylor's liability for any potential negligence on his part. Summary judgment on this claim is not warranted.

## VII.

For these reasons, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

---

[10]Because we find that bad faith can be shown by Taylor's alleged violation of King's clearly established constitutional rights, we do not consider whether it also can be shown by way of "corrupt motive" or "malicious intent" on the part of Taylor. *Yanero*, 65 S.W.3d at 523.