NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0124n.06

No. 11-3404

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Feb 04, 2013**
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| TREMAINE NELMS; KAYLEN ALLI, | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) |
| v. | ) |
| | ) |
| WELLINGTON WAY APARTMENTS, LLC, c/o | ) |
| Statutory Agent Thomas H. Lagos; THOMAS H. | ) |
| LAGOS; TINA LAGOS; SHIRLEY MORELAND; | ) |
| THE CITY OF COLUMBUS, c/o Mayor Michael B. | ) |
| Coleman; MICHAEL FLEMING, Columbus, Ohio | ) |
| Division of Police; LOWELL WHITT, Columbus, | ) |
| Ohio Division of Police, | ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

BEFORE: COOK and GRIFFIN, Circuit Judges; and COHN, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiffs Tremaine Nelms and Kaylen Alli appeal the district court's entry of summary judgment in favor of defendants. We affirm in part and reverse in part. Specifically, we summarily affirm with respect to plaintiffs' claims under the federal Fair Housing Act and adopt the reasoning of the district court on those claims. We reverse with respect to Nelms's federal constitutional claims against defendants Michael Fleming, Lowell Whitt, and Tina Lagos, as well as his Ohio

_____

[*]The Honorable Avern L. Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

statutory claim for unlawful entry against defendant Wellington Way Apartments, LLC, Thomas Lagos, and Tina Lagos (the "Wellington defendants").

I.

At all relevant times, Tremaine Nelms was a resident of the Wellington Way Apartments in Columbus, Ohio. In April 2007, Kaylen Alli, who is Nelms's brother, and a few friends were visiting Nelms's apartment in the late afternoon. As the teens were leaving the apartment, one of them tripped on another's foot, causing both to fall, one directly to the ground and the other into a wooden privacy fence, damaging the fence.[1] An apartment employee apparently saw what happened and called the police.

Dispatched to the apartment on a report of property damage in progress, police officers Michael Fleming and Lowell Whitt arrived to a calm scene outside of Nelms's apartment; none of the teens or adults standing outside were shouting or otherwise causing a ruckus. Fleming spoke first with Tina Lagos, an owner and representative of the apartment complex. Lagos said an employee told her that she saw a fight that resulted in damage to the fence. Lagos said the employee thought it "possible that one person that was involved in this fight . . . was in the apartment." The officers, however, saw nothing to suggest there had been a fight. The youths generally denied that there had been a fight. Alli testified that he answered any questions the officers asked; he was not evasive or uncooperative.

---

[1]The four-foot-tall fence remained upright, despite the damage. It became partly detached from the apartment's exterior wall, which allowed it to sway back and forth.

After conducting his investigation, Fleming told Lagos that he could not "determine what transpired in . . . relationship to the destroyed fence and what the [employee] witnessed." At this point, Lagos mentioned that there may be damage to the inside of Nelms's apartment, and that Nelms could be continuing the damage because he was angry that the police had been called. As the conversation progressed, Fleming speculated that there might be someone inside the apartment who had been injured in a fight. Fleming did not speak with the apartment employee about the details of her observations or the basis for her belief that a person involved in the incident might be inside the apartment.

Fleming then began to question Lagos about the lease and whether the landlord had a right to enter a tenant's apartment without consent. Lagos informed Fleming that the lease permitted the landlord to enter and inspect the property for damage. Thereafter, Fleming knocked on Nelms's front door and window, but there was no response. He then asked Lagos to retrieve a key to the apartment, which she did. With his gun drawn, Fleming entered Nelms's apartment with Whitt.

According to Alli, one of the officers—presumably Whitt—began to "flip[ ] through couches, through the cushions, looking for whatever" while the other officer—likely Fleming—went "around the corner" inside the apartment. Fleming found Nelms, fully clothed, standing in a bathtub. Upon finding Nelms, Fleming holstered his gun and drew his Taser. He then directed Nelms to his couch, sat him down, asked if there was "anything illegal" in the apartment, threatened to take him to jail if anything were found, and then searched his kitchen cabinets and living and utility rooms. Fleming

walked Nelms outside and placed him in the back of a police cruiser. He then reentered the apartment.

Nelms's mother complained to the Columbus Police Department, claiming Fleming entered her son's apartment illegally. Following an investigation by the Department's internal affairs bureau, police sergeant Dennis Weyandt concluded that Fleming's conduct complied with department policy "as it relates to a reasonable belief that the action is necessary to preserve life and limb or to provide immediate aid to involved person(s)." Two superior officers agreed. But Police Commander Jeffrey Blackwell disagreed, concluding that "the belief that emergency or exigent circumstances dictated the entrance by Officer Fleming is flimsy and not plausible." From his review of the file, Blackwell saw "no substantive evidence of any medical emergency" that would have allowed officers to enter Nelms's residence without a warrant. He recommended that Fleming be formally disciplined for his conduct. Deputy Police Chief John Rockwell disagreed with Commander Blackwell. He found that, while the department does not "necessarily encourage officers to enter under such circumstances, entering under the landlord's authority has generally been upheld by the courts."[2] This was the police department's final decision on the matter.

This lawsuit followed. As relevant here, Nelms alleged that Fleming and Whitt violated his rights under the Fourth Amendment when they entered and searched his apartment without a warrant.

---

[2]Deputy Chief Rockwell was mistaken. It is well established under the Fourth Amendment that a landlord may not "consent" to the entry of a tenant's home. *See Chapman v. United States*, 365 U.S. 610 (1961). During the internal investigation, Fleming told a superior officer that he believed he was performing a "consent search" authorized by the lease. In fact, one of the reviewing officers *advised Fleming* that he was operating under exigent circumstances when he entered.

- 4 -

He further asserted that Tina Lagos conspired with the officers in this regard and was therefore liable under 42 U.S.C. § 1983. Finally, he claimed that the Wellington defendants violated Ohio law when their agents entered his apartment without giving reasonable notice. After discovery, all defendants filed motions for summary judgment, which the district court granted.

Nelms timely appealed.

## II.

We review de novo a district court's grant of summary judgment. *King v. Taylor*, 694 F.3d 650, 661 (6th Cir. 2012). Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view the facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *King*, 694 F.3d at 661.

## III.

Nelms first challenges the officers' warrantless entry and search of his apartment. The district court ruled as a matter of law that exigent circumstances existed to enter the apartment without a warrant because the officers had reason to believe "that a person inside the apartment was seriously injured and unable to respond" to the officers' knock on the door. It further ruled that no jury could believe testimony from Nelms and Alli that officers searched the apartment after locating and ensuring that Nelms did not require medical attention. Because genuine disputes of material fact exist, summary judgment on these two claims and the officers' qualified-immunity defense was not warranted.

A.

1.

The Fourth Amendment provides that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. And the Supreme Court has instructed that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks omitted). Accordingly, warrantless entries into the home are "presumptively unreasonable" under the Fourth Amendment. *Id.* at 586.

However, this presumption of unreasonableness can be "overcome," *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009) (per curiam), when a warrantless entry falls within one of the "well-delineated" exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). At issue in the present case is the exception that a warrant is not required to enter a person's home when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless [entry] is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (internal quotation marks omitted).

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Under this "emergency aid" exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* Officers do not need "ironclad proof of a likely serious, life-threatening injury to invoke the

emergency aid exception[.]" *Fisher*, 130 S. Ct. at 549 (internal quotation marks omitted). But by the same token, their decision to enter must be based on more than a hunch or "the mere possibility" that someone inside needs immediate aid. *See United States v. Radka*, 904 F.2d 357, 362 (6th Cir. 1990); *United States v. Delgado*, 814 F. Supp. 2d 874, 885 (E.D. Wis. 2011) ("The government has no right to enter a private residence on a mere whim that a person in need of assistance may be inside[.]" (reversed on other grounds, 701 F.3d 1161, 1165–66 (7th Cir. 2012))). Consistent with the Fourth Amendment's "ultimate touchstone" of reasonableness, officers must have an "*objectively reasonable* basis for believing" that "a person within the house is in need of immediate aid." *Fisher*, 130 S. Ct. at 548 (internal quotation marks and brackets omitted) (emphasis added).

"*Brigham City* illustrates the application of this standard." *Fisher*, 130 S. Ct. at 548. There, four officers responded, at 3 o'clock in the morning, to a call about a loud party at a residence. When they arrived, they heard "an altercation occurring, some kind of fight" inside the residence. *Brigham City*, 547 U.S. at 406. They heard "thumping and crashing" and people yelling "stop, stop" and "get off me." *Id.* According to one officer, "it was loud and . . . tumultuous." *Id.* The noise came from the back of the house, so the officers went to the backyard to investigate. They saw two juveniles drinking beer and—through a screen door and windows—a fight underway in the kitchen. Four adults were attempting to restrain a juvenile who had broken free and slugged one of the adults in the mouth. The adults pinned the juvenile against a refrigerator with such force that the refrigerator began to move along the floor. At that point, an officer opened the screen door (but did not enter) and announced his presence. When no one noticed, the officer entered the kitchen and

again cried out. The fight eventually ceased when the individuals became aware that police had arrived. The Court held that the officers "had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning," permitting them to enter the home to quell the violence. *Id.* at 406.

In another "straightforward" application of the emergency aid exception, the Court in *Fisher* deemed reasonable an officer's warrantless home entry. In that case, officers responded to a report that a man was "going crazy" inside a residence. 130 S. Ct. at 547. The home was in "considerable chaos" when officers arrived—"a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside." *Id.* Wet blood was on the hood of the truck, the clothes inside it, and the home's front door. Through a house window, officers observed the defendant with a fresh cut on his hand, screaming and throwing things. The back door was locked and a couch blocked the front door. The officers knocked, but the defendant refused to answer. When officers asked the defendant through an open window if he needed medical assistance, he cursed at them and demanded that they get a warrant. At that point, an officer pushed open the front door and entered the home*. Id.* The entry was lawful, the Court held, because the officers could reasonably believe that the items being thrown "might have a human target (perhaps a spouse or a child)," or that the defendant "would hurt himself in the course of his rage." *Id.* at 549.[3]

---

[3]Cases where we have upheld a warrantless home entry based on the emergency aid exception include: *Stricker v. Twp. of Cambridge*, — F.3d —, 2013 WL 141695, at \*7–8 (6th Cir. Jan. 14, 2013); *Johnson v. City of Memphis*, 617 F.3d 864, 869–70 (6th Cir. 2010); *Schreiber v. Moe*, 596

2.

As the cases demonstrate, each time this court has upheld a warrantless entry based upon the emergency aid exception, credible and reliable evidence established "the potential for injury to the officers or others and the need for swift action[.]" *United States v. Huffman*, 461 F.3d 777, 785 (6th Cir. 2006) (observing these two "dispositive factors" to be "consistently found" in the cases involving the emergency aid exception). No such evidence exists in this case. When the facts are viewed in the light most favorable to Nelms, the officers lacked a reasonable basis to believe that an occupant of the apartment was in need of immediate aid. Instead, as former Columbus Police Commander Jeffrey Blackwell (now Deputy Chief) concluded, the belief that an exigency existed "is flimsy and not plausible."

The defendant officers argue that the following facts gave them reason to believe an exigency existed: (1) they were dispatched on a call of property destruction in progress; (2) an apartment complex employee said she saw a fight that resulted in damage to a fence and believed one of the fighters might be inside the apartment; (3) damage to the fence; (4) prior complaints of drug activity in the area; (5) Alli said he did not know if his brother was inside the apartment or had already left; and (6) no one answered the door when the officers knocked. But most of these reasons are

F.3d 323, 329–31 (6th Cir. 2010); *Ziegler v. Aukerman*, 512 F.3d 777, 785–86 (6th Cir. 2008); *Lawrence v. Bloomfield Twp.*, 313 F. App'x 743, 747–48 (6th Cir. 2008) (per curiam); *United States v. Huffman*, 461 F.3d 777, 784–85 (6th Cir. 2006); *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 656 (6th Cir. 2006); *Causey v. City of Bay City*, 442 F.3d 524, 529 (6th Cir. 2006); *Thacker v. City of Columbus*, 328 F.3d 244, 254–55 (6th Cir. 2003).

genuinely disputed, and those that are not, even when aggregated, fail to establish exigent circumstances.

First, the reason for the dispatch—property destruction in progress—provided no reason to believe *anyone* was injured, let alone that someone inside Nelms's apartment was injured to the point of requiring immediate medical attention. The call concerned alleged damage *to property*, not persons.

Second, the apartment complex's employee speculated that one of the alleged fighters "might" be inside the apartment but did not claim that the alleged fighter was injured. Officer Fleming never interviewed the employee regarding her specific observations. Instead of asking the employee questions, Fleming spoke with Lagos, who was not present when the fence was damaged. Fleming learned during this conversation that Nelms was being evicted for failing to timely pay the rent[4] and that Lagos was concerned that Nelms had damaged, or was then in the process of damaging, the apartment.

The defendant officers also rely on the damaged fence. Although the fence was in fact damaged, its condition did not provide exigent circumstances to enter the apartment without a warrant.

Finally, the officers point out that (1) there had been complaints of drug activity in this general area of the apartment complex, and (2) no one answered when the officers knocked.

---

[4]Alli said he heard Fleming tell Whitt that Nelms was being evicted because his parents did not pay the rent on time.

Although Whitt recalled receiving complaints about a drug problem at the complex, he could not recall when they were made, how many were made, or which apartments they concerned. He certainly never received complaints regarding Nelms's apartment specifically. And even though Whitt typically handled complaints from the complex, he never once investigated a drug complaint. A reasonable officer would not rely on unsubstantiated complaints of drug activity to establish exigent circumstances to enter Nelms's apartment. Also, a failure to respond to a knock on the door certainly can be a factor supporting a reasonable belief that someone inside needs immediate aid, but it cannot *create* that belief. Nothing suggested anyone was inside and needed help, so the lack of a response added nothing. *Cf. Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009) ("The mere fact that Hopkins did not answer the door cannot tip the balance in the officers' favor[.]").

We hold that the facts viewed in the light most favorable to Nelms demonstrate that Fleming and Whitt lacked a reasonable belief that a person inside Nelms's apartment was in need of immediate aid.

3.

We further conclude that Nelms's right to be free from a warrantless entry into his home under the circumstances presented here was "clearly established" at the time and thus the officers are not entitled to summary judgment on their qualified-immunity defense. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

It is not necessary to have "a case directly on point" for a right to be "clearly established." It is sufficient that existing precedent place the question "beyond debate." *Id.*; *see also Hope v.*

*Pelzer*, 536 U.S. 730, 741 (2002) (recognizing that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). The ultimate question is whether the officer had "fair warning" that his conduct deprived the plaintiff of a constitutional right. *Hope*, 536 U.S. at 740. In view of the overwhelming authority and limited information obtained during the officers' cursory investigation, reasonable officers would conclude that entering Nelms's apartment without a warrant violated the Fourth Amendment. Fleming and Whitt are not entitled to summary judgment on their defense of qualified immunity.

B.

In addition, we conclude that a genuine dispute of material fact exists regarding Nelms's separate claim that the officers unlawfully searched his apartment after finding him. *See Mincey*, 437 U.S. at 393 (explaining that "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation'" (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968))).

Testimony from Nelms and Alli directly supports this claim and is sufficient by itself to defeat summary judgment. *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (explaining that the plaintiff's testimony can be sufficient to create a jury question). The district court nevertheless granted summary judgment, concluding that no reasonable jury could believe the testimony. Specifically, the court found Nelms's testimony that Fleming searched his apartment immediately after locating him and again later after removing him unbelievable because (1) it "is not otherwise substantiated by the record," (2) Nelms "admittedly suffers from a mental condition that causes paranoia," and (3) Nelms failed to mention the search during a police interview ten days after

the incident. As for Alli's testimony that he saw an officer—presumably Whitt—rummage through couch cushions after entering Nelms's apartment, the court found it similarly unbelievable given that Alli (1) was "sitting in the back of a police cruiser during the search," and (2) appeared to equivocate on the matter in an earlier statement to police.

The district court erred. It is fundamental that a judge may not make credibility determinations or otherwise weigh the evidence when ruling on a summary-judgment motion; such functions are for the finder of fact after a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An exception exists where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In *Harris*, for instance, because a video recording "quite clearly contradict[ed]" the plaintiff's version of events, the Court disregarded the plaintiff's testimony on summary judgment. *Id.* at 378. In this case, by contrast, we have differing verbal accounts of what transpired inside the apartment, neither of which is belied by "objective evidence in the record." *Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011). Summary judgment is not appropriate on this claim.

IV.

Next, Nelms challenges the entry of summary judgment on his § 1983 claim against Tina Lagos for conspiring with Fleming and Whitt to enter and search Nelms's apartment.

Although she is a private actor, Lagos nevertheless may be liable under § 1983 if she conspired with state actors to deprive Nelms of his federally-secured rights. *See Dennis v. Sparks*,

449 U.S. 24, 27–28 (1980). "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985). To prove conspiracy, Nelms must establish that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive Nelms of his rights, and (3) an overt act was committed. *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). Circumstantial evidence can prove a conspiracy. *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000).

In granting Lagos summary judgment on this claim, the district court required too much of Nelms and took an overly narrow view of conspiracy. Lagos and Fleming discussed Lagos's desire to search Nelms's apartment for damage and to ensure that "nothing else was going on." She also told Fleming that Nelms was in the process of being evicted and was concerned he might damage the apartment in retaliation for the police being called. Finally, Lagos and Fleming discussed the terms of Nelms's lease to determine whether there was a contractual right to enter the apartment without a warrant or consent. These facts are sufficient to permit a jury to infer the existence of a conspiratorial agreement between Lagos and Fleming to unlawfully enter and search Nelms's apartment. That Lagos and Fleming might have had different motives for entering makes no difference, for subjective motivations are "irrelevant" under the Fourth Amendment. *Brigham City*, 547 U.S. at 404.

## V.

Finally, Nelms claims that the Wellington defendants violated Ohio law when the complex's maintenance man entered Nelms's apartment before police arrived and when Tina Lagos later

unlocked it so the officers could enter. Under Ohio law, unless there is an "emergency or it is impracticable to do so," a landlord must "give the tenant reasonable notice of [the] intent to enter and enter only at reasonable times." Ohio Rev. Code § 5321.04(A)(8). The district court held that an emergency existed. For reasons stated above, that question is in genuine dispute.

The district court concluded that this claim failed also because Nelms could prove no "actual damages" from the entry. *See id.* § 5321.04(B) (authorizing the recovery of "actual damages resulting from the entry"). The court agreed with the Wellington defendants that "actual damages" essentially means *economic* damages.

The Wellington defendants' argument is meritless. The Ohio Supreme Court has explained that "actual damages is a term synonymous with compensatory damages," and that compensatory damages include *non*-economic damages such as "mental pain and suffering." *Whitaker v. M.T. Auto., Inc.*, 855 N.E.2d 825, 831 (Ohio 2006) (internal quotation marks omitted). Nelms allegedly suffers from nightmares, depression, and fear of the police as a result of the incident. These are "actual damages" for which the Ohio statute authorizes recovery.

VI.

For these reasons, we affirm in part and reverse in part the judgment of the district court. The portion entering summary judgment against Nelms and Alli on their claims under the federal Fair Housing Act is affirmed. The portion entering summary judgment in favor of Fleming, Whitt, and Lagos on Nelms's federal constitutional claims is reversed, as is the portion entering summary

judgment on Nelms's Ohio statutory claim against the Wellington defendants for unlawful entry.

The case is remanded for further proceedings consistent with this opinion.